**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADONA LLC, EGOZ I LLC, EGOZ II LLC, MASTERGEN, LLC, ERYTHRINA, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO HOLDING CORPORATION,<br><br>　　　　　　　　　　　　　　Plaintiffs,<br><br>　　-against-<br><br>THE REPUBLIC OF ARGENTINA,<br><br>　　　　　　　　　　　　　　Defendant. | Case No. 19 Civ. 11338<br><br>**COMPLAINT** |

　　　　Plaintiffs Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO Holding Corporation (collectively, "Plaintiffs"), by and through the undersigned counsel, bring this action against Defendant the Republic of Argentina ("Argentina") alleging, based upon personal knowledge as to their own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

　　　　1.　　　　This is a civil action for breach of contract and for breach of the covenant of good faith and fair dealing against Argentina as a result of Argentina's bad faith failure to pay millions of dollars owed to Plaintiffs on securities issued by Argentina in 2005 and 2010.

　　　　2.　　　　In 2005 and 2010, Argentina issued certain U.S. Dollar-Denominated New York law GDP-Linked Securities, designated by ISIN: US040114GM64 (the "2005 GDP Warrants") and ISIN: XS0501197262 (the "2010 GDP Warrants" and collectively with the 2005 GDP Warrants, the "GDP Warrants"). The GDP Warrants were structured as part of an exchange

1

whereby Argentina provided investors holding defaulted Argentine debt with newly issued securities in return.

3.      A key component of the GDP Warrants is that Argentina assumed a duty to pay holders of the GDP Warrants (such as Plaintiffs) that is contingent on the performance of Argentina's economy from year to year.  In particular, Argentina's payment obligations are only triggered if Argentina's economy, as measured by its Gross Domestic Product ("GDP"), surpasses certain threshold metrics.  Argentina's payment obligations under the GDP Warrants are set forth in several key documents: (i) the Trust Indenture, dated as of June 2, 2005 (a copy of which is attached hereto as Exhibit A); (ii) the 2005 Form of Registered Global Security (a copy of which is attached hereto as Exhibit B) (the "2005 Global Security"); (iii) the First Supplemental Indenture, dated as of April 30, 2010, applicable to the 2010 GDP Warrants (a copy of which is attached hereto as Exhibit C); and (iv) the 2010 Form of Registered Global Security (the "2010 Global Security", collectively with the Trust Indenture, 2005 Global Security, and the First Supplemental Indenture, the "Governing Documents"), applicable to the 2010 GDP Warrants only (a copy of which is attached hereto as Exhibit D).[1]

4.      The Governing Documents also set forth the contractual method for determining whether Argentina must make a payment to the holders of the GDP Warrants in any particular year, and the amount of such payment.  Specifically, pursuant to the unambiguous terms of the Governing Documents, Argentina is required to pay holders of the GDP Warrants if three conditions are met in any given year (the "Reference Year"):

---

[1] The 2005 Global Security and the 2010 Global Security are, in all material ways, similar, and are therefore referred to herein collectively as the "Global Security."  Where applicable, we have parallel cited to both the 2005 and 2010 Global Securities for clarity.

> (i)     Actual Real GDP of Argentina is higher than the Base Case GDP;
>
> (ii)    Actual Real GDP Growth of Argentina is greater than Base Case GDP Growth; and
>
> (iii)   the aggregate amount of all payments made on the GDP Warrants does not exceed a Payment Cap.[2]

5.      The Global Security provides tables from which "Base Case GDP" and "Base Case GDP Growth" can be derived. For Actual Real GDP and Actual Real GDP Growth, the Global Security mandates that these figures be sourced from Argentina's national economic statistics agency, the Instituto Nacional de Estadistica y Censos ("INDEC"). INDEC has published the country's GDP data, both on a quarterly and yearly basis, for over 30 years. INDEC's statistics therefore are a necessary component to determine whether Argentina's GDP and GDP growth satisfy the triggers for yearly GDP Warrant payment obligations.

6.      As explained below, the methodology for calculating the amount of any payments under the Governing Documents is material to the Governing Documents, as it directly affects the rights of the GDP Warrant holders. Indeed, any change to the method of calculation of the payment amount under the Governing Documents requires the approval of at least a 75% supermajority vote of the aggregate notional amount of the GDP Warrants then outstanding.

7.      In late 2013 and early 2014, in advance of INDEC's official announcement of Argentina's Actual 2013 GDP, economic data published by INDEC indicated that Argentina's Actual Real GDP had grown at a rate sufficient to trigger the GDP Warrant payment obligations as set forth in the Governing Documents. Specifically, for the first three quarters of 2013—reported in July 2013, October 2013, and January 2014, respectively—INDEC reported quarterly GDP growth of 3.0%, 8.3%, and 5.5%.

---

[2] Capitalized terms not otherwise defined within this Complaint shall have the meanings ascribed to them within the Global Security.

8.      Moreover, in February 2014, INDEC published its annual yearly GDP estimate for 2013 (called the Estimador Mensual de Actividad Económica ("EMAE") Index),[3] which is an incredibly reliable predictor of Argentina's GDP growth rates.  Consistent with the strong quarterly data published by INDEC throughout 2013 and early 2014, the EMAE Index estimated that Argentina's 2013 Actual Real GDP, measured in 1993 prices, had grown by 4.91%.[4]  This growth rate would far exceed the GDP growth rate required to trigger payments under the Governing Documents.

9.      Given this favorable economic data, Argentina knew well in advance of its formal announcement and publication of 2013 Actual Real GDP that it would be required to make payments to holders of the GDP Warrants.  This revelation was sobering.  While Argentina had previously made payments to holders of the GDP Warrants under the terms of the Governing Documents, the amount owed in 2013 would have exceeded the amount paid in any year prior, and Argentina was facing political and economic pressure to deny payment.

10.     Confronted with the certain obligation of making a significant payment under the Governing Documents based on the country's 2013 GDP growth, in March 2014—prior to the official announcement of Argentina's GDP—Argentina took advantage of a process known as "re-basing."  Re-basing is a method used by countries to re-calibrate their GDP by updating the base year for determining the prices of the goods and services that ultimately determine GDP to account for relative price changes that naturally occur over time.  Because re-basing involves changing the base prices by which output is measured, re-basing necessarily changes a country's

---

[3] *See* "Estimador Mensual de Actividad Económica," Instituto Nacional de Estadstica y Censos (Feb. 21, 2014), available at https://www.indec.gob.ar/indec/web/Institucional-Indec-InformesTecnicos.  "Estimador Mensual de Actividad Económica" translates roughly into "Monthly Estimate of Economic Activity."

[4] The 4.91% growth rate is calculated by taking the average "Original Series Index" included within the February 2014 EMAE Index for 2013 and dividing it by the average "Original Series Index" included within the February 2014 EMAE Index for 2012, rounded to the nearest one-hundredth percent.

GDP and GDP growth rates.  Argentina's re-basing adjusted the year of base prices from 1993 to 2004, which reduced the country's reported GDP growth from the 4.91% figure (reported in February 2014 using 1993 base prices) to only 2.93% using 2004 base prices.  Re-basing often reduces calculated GDP growth rates because relative prices tend to decrease for growing sectors.

11.     Re-basing can be a perfectly legitimate means of ensuring that a country's economic data stays current.  However, to protect GDP Warrant holders and Argentina alike against fluctuations caused by re-basing, the Governing Documents set forth procedures to calculate GDP, GDP growth and other metrics following a re-basing.  Specifically, the Governing Documents mandate that in the event of a re-basing, Argentina must recalculate and modify the conditions necessary for payment to the holders of the GDP Warrants.  Argentina failed to adhere to these terms, and furthermore elected not to obtain the approval of at least 75% of GDP Warrant holders in deviating from these terms, as would otherwise be required.

12.     Instead, improperly leveraging its re-basing, Argentina used its re-based growth percentage (without making the corresponding adjustments required by the Governing Documents), to erroneously assert that its revised GDP growth rate was below the threshold to trigger its payment obligations for 2013.  This assertion was knowingly false and made in bad faith.  As explained more fully below, had Argentina not breached the plain requirements set forth in the Governing Documents dealing with recalibrating the conditions necessary for payment, Argentina would have been required to pay holders of the GDP Warrants for 2013.

13.     In addition to failing to make the necessary adjustments required under the Governing Documents, Argentina also used its re-base to sow confusion and avoid publishing the data necessary to calculate key metrics that would help invalidate Argentina's bad-faith

5

conclusions with respect to payments of the GDP Warrants for 2013.  In particular, for the first time since utilizing 1993 as its base year, Argentina ensured that INDEC *did not publish its 2013 Actual Real GDP in 1993 prices*.  Without this information being available to investors, Argentina attempted to incorrectly maintain that the EMAE Index published just a month before the re-basing—which would have triggered Argentina's payment obligations—was unreliable and could not be used to determine whether the payment conditions of the Governing Documents were met.  Argentina also sought to leverage this deliberate omission in order to reduce the ability of investors to question or scrutinize its determinations with respect to the triggering of its payment obligations.[5]

14.  In public filings concerning ongoing litigation before this Court, Argentina claims that the Governing Documents include "binding effects" clauses, which prevent investors from challenging its determination to provide payments under the Governing Documents.  Argentina focuses on language included within the Global Security that states that Argentina's Ministry of Economy is vested with the power to run the appropriate "calculations" under the Governing Documents, and "such calculations shall be binding" on holders of the warrants.  However, these provisions are only included within the definitions of "Excess GDP" and "Payment Amount" in the Global Security, and there is nothing to indicate that this language was intended to shield Argentina from having to follow the specific calculation terms included within the Governing Documents.  To the contrary, any modification to "the method of calculation of the Payment Amounts" is an expressly enumerated Reserved Matter in Section 22 of the Global Security

---

[5] Argentina's manipulative and bad-faith conduct has been laid bare in several litigations filed within this district in recent months, including *683 Capital Partners, LP v. The Republic of Argentina*, Index No. 1:19-cv-10131 (S.D.N.Y. filed Oct. 31, 2019) (hereinafter, the "683 Capital Partners Complaint"), *Novoriver, S.A. v. Argentine Republic*, Index No. 1:19-cv-09786 (S.D.N.Y., filed Oct. 23, 2019), and *ACP Master, Ltd. v. The Republic of Argentina*, Index No. 1:19-cv-10109 (S.D.N.Y. filed Oct. 31, 2019).

deemed so fundamental to the intent of the contract that it requires 75% supermajority vote of the aggregate notional amount of outstanding GDP Warrants to modify.  Even if the "binding effects" clauses cited by Argentina are applicable (and they are not), these clauses are inapplicable to the dispute at hand by their own terms, because Argentina's conduct was done in bad faith, constituted willful misconduct, and the resulting "calculation" demonstrates manifest error.

15.     But for Argentina's improper actions, it is evident that, for Reference Year 2013, all three conditions mandating payment to holders of the GDP Warrants are met.  As a result, the GDP Warrants require Argentina to pay, at minimum, USD $1,320,255,073.65 to holders of the GDP Warrants.  Pursuant to the Governing Documents, this amount should have been paid on December 15, 2014.  Argentina breached its contractual obligations to Plaintiffs by neglecting to follow the procedures set forth within the Governing Documents and make this payment.  In the alternative, Argentina has violated the covenant of good faith and fair dealing owed to Plaintiffs by intentionally maneuvering to undermine the spirit of its agreements with Plaintiffs.

16.     As a result, had Argentina honored its contractual obligations and its duties to act in good faith under the terms of the GDP Warrants, it would have been required to make payment to the holders of the GDP Warrants.  As holders of the GDP Warrants, Plaintiffs therefore initiate this suit to recover amounts in excess of $75 million owed by Argentina under the express terms of the GDP Warrants.  In addition, Plaintiffs are entitled to prejudgment interest at a rate of 9% from the time of Argentina's breach, as well as injunctive relief to prevent similar breaches in the future.

## PARTIES

17.     Plaintiff Adona LLC is a Delaware limited liability company and holder of GDP Warrants.

18.     Plaintiff Egoz I LLC is a Delaware limited liability company and holder of GDP Warrants.

19.     Plaintiff Egoz II LLC is a Delaware limited liability company and holder of GDP Warrants.

20.     Plaintiff Mastergen, LLC is a Delaware limited liability company and holder of GDP Warrants.

21.     Plaintiff Erythrina, LLC is a Delaware limited liability company and holder of GDP Warrants.

22.     Plaintiff AP 2016 1, LLC is a Delaware limited liability company and holder of GDP Warrants.

23.     Plaintiff AP 2014 3A, LLC is a Delaware limited liability company and holder of GDP Warrants.

24.     Plaintiff AP 2014 2, LLC is a Delaware limited liability company and holder of GDP Warrants.

25.     Plaintiff WASO Holding Corporation is an Exempted Company incorporated in the Cayman Islands and holder of GDP Warrants.

26.     The Governing Documents for the GDP Warrants expressly acknowledge "the right of any beneficial owner [of the GDP Warrants] to pursue [defaulted payments and seek other remedies under the Governing Documents] with respect to the portion of this Global Security that represents such beneficial owner's interest . . .  as if Certificated Securities had been issued to such beneficial owner."  (Ex. B at R-13; Ex. D at R-11.)  Section 4.9 of the Trust

8

Indenture further provides that "each Holder of Debt Securities shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on its Debt Security on the stated maturity date for such payment expressed in such Debt Security . . . and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder." (Ex. A at 25.)  As a result, Plaintiffs have the right to bring this action on their own behalf in order to pursue the remedies available to a holder of the GDP Warrants with respect to their beneficial holdings.

27.     Defendant the Republic of Argentina is a foreign state as defined in 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

28.     Under the terms of the Governing Documents, Argentina agreed to irrevocably waive sovereign immunity to the fullest extent permitted by the laws of the United States with respect to the GDP Warrants.  Argentina is therefore not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement, and this Court therefore has jurisdiction pursuant to 28 U.S.C. § 1330, which provides this court with jurisdiction over actions brought against a foreign state.  (Ex. B at R-16; Ex. D at R-13.)

29.     Within the Governing Documents, Argentina also submitted to the jurisdiction of this Court over any action with respect to the GDP Warrants.  In particular, the Global Security provides that:

> [T]he Republic irrevocably submits to the jurisdiction of any New York state or federal court sitting in the Borough of Manhattan, the City of New York, and the courts of the Republic . . . over any suit, action or proceeding against it or its properties, assets or revenues with respect to the [GDP Warrants].

(Ex. B at R-15; Ex. D at R-12.)  Argentina further appointed Banco de la Nación Argentina, at its office at 225 Park Avenue, New York, New York, 10169, as its authorized agent for service of process.  (Ex. B at R-15; Ex. D at R-12.)

30.      As set forth in the Governing Documents, Argentina expressly waived any "objection which it may now or hereafter have . . . on the grounds of venue, residence or domicile or on the ground that the [action has] been brought in an inconvenient forum," and venue is proper in this district pursuant to 28 U.S.C. § 1391(f).  (Ex. B at R-15; Ex. D at R-12.)

31.      Argentina agreed that the Governing Documents shall be "governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law."  (Ex. B at R-14; Ex. D at R-12.)

## FACTUAL ALLEGATIONS

### A.      A Primer On Argentina's GDP Warrants And GDP

32.      In the latter half of 2001, Argentina's economy was in the midst of a financial crisis.  In an attempt to alleviate some of its financial burdens, in December 2001, Argentina announced that it would defer interest and principal payments to its debtholders.  As a result, Argentina defaulted on more than USD $81 billion of sovereign debt.  This decision led to a number of legal claims being brought against Argentina by holders of Argentina's defaulted debt, miring Argentina in litigation.

33.      In January 2005, in part to assuage holders of Argentina's defaulted sovereign debt, Argentina launched a voluntary "debt exchange."  Under this proposal, investors holding Argentina's non-performing debt could exchange their securities for a bundle of new securities, including, in part, the 2005 GDP Warrants.  Argentina offered a similar exchange again in 2010, whereby an investor could exchange similar non-performing securities in return for a bundle of

new securities, including, in part, the 2010 GDP Warrants.  Investors under both exchanges

agreed to a significant reduction in the value of their claims.

34.     As their name suggests, the GDP Warrants tie investors' rights of payment to

Argentina's yearly economic performance, using the metric of GDP.  Such GDP-linked bonds

are a hybrid security—they do not include any fixed return, but instead provide purchasers with

an interest in the overall economic performance of the issuing country.  In this way, GDP-linked

securities such as the GDP Warrants protect the issuing country: if GDP growth fails to meet

expectations, the issuing country is not required to make any payments; if GDP growth exceeds

expectations, investors are supposed to be able to share in some of the benefits of that GDP

growth.

35.     Because the GDP Warrants rely on the metric of Argentina's GDP, a brief

discussion of GDP is instructive.  GDP is the total value of all goods and services produced by

labor and property within a country during a period.  GDP can be calculated by adding together

amounts from private consumer spending, business investment, government expenditures, and

net exports.

36.     GDP in particular is a logical reference variable for issuers and investors.  It is a

widely published number, comparable across countries, and can typically be forecasted based on

both public and private data.  Furthermore, GDP is a commonly used and widely embraced

measure of a country's economic output, including by well-regarded international institutions

such as the United Nations and the International Monetary Fund.  Indeed, GDP is the most

commonly used measure of a country's overall level of economic activity.

37.     GDP can be presented in a number of different formats, including "nominal GDP"

and "real GDP."  Nominal GDP for a given year includes the effects of changes in pricing for

11

goods and services for the given year.  Therefore, year-over-year nominal GDP could rise or fall based on the increase or decrease of the price of goods caused by inflation or deflation.  Real GDP uses the prices of a particular base year so that the prices used in computing GDP remain constant.  By using real GDP, a country can compare annual outputs while controlling for price fluctuations.  The Governing Documents use the term "Actual Real GDP" as an instantiation of real GDP.

38.      Until 2014, Argentina used 1993 as its base year for the purposes of calculating its real GDP.  Thus, to calculate Argentina's year-over-year GDP growth rate while controlling for changes in prices, an investor would compare the current year's Actual Real GDP in 1993 prices to the prior year's Actual Real GDP, also in 1993 prices, and calculate the rate of growth over that period.  The equation for determining this growth rate is as follows:

$$\text{Yr-2 Actual Growth Rate}_{\text{(Expressed in 1993 Base Year)}} = \left( \frac{\text{Yr-2 Actual GDP}_{\text{(Expressed In 1993 Base Year)}}}{\text{Yr-1 Actual GDP}_{\text{(Expressed In 1993 Base Year)}}} \right) - 1$$

39.      As a practical example, Argentina's Actual Real GDP for 2012 was ARS 468,301 MM, and its Actual Real GDP for 2011 was ARS 459,571 MM (both using 1993 as the base year for GDP).[6]  Using the above equation, Argentina's Actual Real GDP growth rate would be 1.89%, as set forth below:

---

[6] Argentine Pesos are designated by the currency code "ARS."



40.     As Argentina used 1993 as its base year for pricing at the time the GDP Warrants were issued, so too did the Governing Documents of the GDP Warrants also use 1993 as the base year for calculating relevant metrics for triggering payment to GDP Warrant holders.

**B.      The Practice Of Re-Basing**

41.     In order to calculate GDP, a country must assign relative weights to the economic output generated by various sectors of its economy and use those weights to determine total economic output.  A country determines how much weight to provide a given sector based on the prices during the base year.  However, this process can lead to skewed GDP results because relative prices change over time.  Thus, as time progresses, base year prices may cease to provide accurate sector weighting.

42.     To more accurately capture real GDP, and to appropriately account for such changes in pricing, a country may periodically update the base year that it uses to calculate real GDP (a process known as "re-basing").  Re-basing is widely acknowledged as an appropriate statistical method to present an accurate reflection of a country's economy.  However, depending on the amount of time that has passed since the base year, as well as changes to the country's economy and pricing, the re-basing process can have a dramatic impact on a country's reported real GDP.  For example, in October 2019, Uganda changed its base year from 2009-2010 to 2016-2017.  After engaging in this process, Uganda's GDP in 2019 went from 109.9 trillion shillings under the old base year to 122.7 trillion shillings using the new base year.

13

43.     Re-basing can have a dramatic effect on other GDP-related metrics as well.  For example, even when converting year-over-year GDP to a new base year, re-basing does not necessarily mean that the *rate of GDP growth* will remain constant, because of the change in relative prices.  For example, in 2013, Nigeria re-based from a 1990 base price to a 2010 base price.  As part of its re-basing, its real GDP growth rate went from 6.58% measured in the old 1990 prices, to 4.21% measured in the new 2010 price.  These changes were not based on any actual change in the country's economic output: rather, the change stemmed from the prices used to measure the value of that economic output.

44.     In order to accurately represent and understand potentially dramatic changes in both real GDP and GDP growth rate, when a country engages in re-basing, it typically publishes real GDP for both the new base year *and the old base year*.  By doing this, the country allows investors to understand the cumulative impact re-basing has on the published numbers.  In 2014 and 2015, for example, Argentina, India, Kenya, Nigeria, Tanzania, Uganda, and Zambia all completed re-basing exercises.  India, Kenya, Nigeria, Tanzania, Uganda, and Zambia all published real GDP for the re-basing year in both the old series and the new series.  Argentina did not.

45.     Instead, Argentina published results using the new 2004 base year prices only.  This decision not only differed from other countries, but it was also in violation of the Global Security, which required Argentina to publish GDP using both sets of prices in order to perform the necessary calculations to determine whether the payment thresholds under the Governing Documents had been satisfied.

C.      **Argentina's Historic Reporting Of GDP**

46.      Argentina's official GDP figures are compiled and reported by the country's national economic statistics agency, INDEC.  Typically, INDEC issues a monthly publication ("INDEC Informa"), which includes statistics and other information about Argentina's economy, including GDP for every quarter throughout the year.  There is generally a three or four month lag between the end of a quarter and when INDEC will first publish GDP for the prior quarter.  Thus, GDP for Argentina's first fiscal quarter, which ends in March, is typically published by July of the same year; GDP for the second fiscal quarter is generally published by October; the third fiscal quarter is generally published by January; and the fourth fiscal quarter (and the full fiscal year) is generally published by April.  While INDEC sometimes adjusts official GDP after initial publication, such adjustments are rare and typically minor.[7]

47.      INDEC generally publishes its year-end GDP four months after year-end, in April of the following year.  Like its quarterly GDP publications, INDEC's year-end GDP adjustments (if any) are typically minor.  In fact, from 2003 through 2012, the initial year-end GDP numbers published by INDEC either were never modified at all or, alternatively, modified by no more than 0.2%.

48.      In addition to official GDP reports, INDEC also typically publishes estimates of economic growth within three months of the end of the relevant period.  This means that INDEC's estimates are available to the public prior to the official GDP figures.  Like the GDP numbers previously discussed, INDEC publishes these estimates throughout the year, and based

---

[7] Indeed, as noted by litigants alleging similar breach claims against Argentina, "for the years 2003 through 2012, [INDEC adjustments] resulted in only small adjustments to growth rate for two years: 2003 (+.1%) and 2008 (-0.2%)."  *See* 683 Capital Partners Complaint, ¶41.

the estimates on similar methodologies used to calculate GDP.  These estimates are known as the "EMAE Index."

49.    INDEC's EMAE Index has historically proven to be an incredibly reliable predictor of GDP growth rates subsequently published by INDEC, often matching the GDP growth rate exactly or deviating by a few tenths of a percentage point.  While INDEC occasionally adjusts the EMAE Index after the initial publication, any adjustments are typically minor and, from 2002 through 2013, INDEC only adjusted the EMAE Index growth rate downwards once.

### D.    Argentina's Abrupt About-Face In Reporting GDP In 2014

50.    Throughout 2013, as with each year prior, INDEC calculated and published Argentina's quarterly GDP in its monthly *INDEC Informa* reports on a regular schedule.  The GDP figures reported were encouraging, and signaled a strong and growing Argentine economy: for the first three quarters, INDEC reported GDP growth in 1993 prices of 3.0%, 8.3%, and 5.5%, respectively.  In all, INDEC estimated that during the first three quarters of 2013, Argentina's Actual Real GDP, measured in constant 1993 prices, grew by 5.5%.

51.    In February 2014, as with each year prior, INDEC published its EMAE Index estimating the GDP growth rate for all of 2013, measured in 1993 prices.  The EMAE Index set forth an estimated GDP growth rate of 4.91%, which was consistent with the three quarters of GDP data published by INDEC previously.

52.    Importantly, estimated growth as set forth in the EMAE Index (which has generally been a spot-on estimate of the Actual Real GDP growth rate), would have been sufficient to trigger payments of the GDP Warrants under the terms of the Governing Documents by a large margin, at a growth rate of 4.91% versus an implied threshold of 3.22%.  After the publication of the EMAE Index, it was readily apparent to Argentina that the yearly real GDP

16

growth rate that was to be published in INDEC in the coming month would certainly trigger a payment of the GDP Warrants.  Indeed, market participants and analysts estimated "conservatively" that Argentina's GDP growth for 2013 would be 5.0% when announced.  However, at Argentina's direction, INDEC failed to publish Argentina's Actual Real GDP in 1993 prices for the fourth quarter of 2013.  Instead, in March 2014, before INDEC published its official year-end GDP figures, Argentina decided to re-base by changing its base year from 1993 to 2004.

53.     Argentina's decision to re-base may have been legitimate.  However, the country's implementation of its decision to re-base (and its ensuing conduct with respect to the GDP Warrants) was immediately suspicious.  As re-based, INDEC's real GDP growth rate for Argentina for 2013 was reported as 2.93% in 2004 pricing.  But rather than adhere to the accepted practice of publishing a re-based year's GDP in both the original and new base years, Argentina neglected to provide Actual Real GDP in 1993 prices for the fourth quarter of 2013 (despite doing so for the prior three quarters).  Instead, in what is a clear effort to avoid triggering payments under the Governing Documents, Argentina only published the Actual Real GDP in 2004 prices.

54.     Worse, Argentina has made no effort to justify *why* it failed to publish this statistic.  Argentina's conduct is particularly suspicious considering that each of Argentina's prior three quarters had been published in 1993 pricing, and the EMAE Index GDP and GDP growth were expressed using this base number as well.  Indeed, Argentina has failed to publish Actual Real GDP in constant 1993 prices at any time since its decision to re-base.

**E.    Argentina's Intentional Failure To Adhere To The GDP Calculation Methodology Set Forth In The Governing Documents**

55.    Because re-basing can lead to dramatic changes in real GDP and real GDP growth rates, the GDP Warrants—as is typical of GDP-linked securities—have express terms that account for the effects of re-basing to ensure that a country's decision to re-base neither negatively nor positively impacts a holder's ability to recover on any given security, and leaves the original bargain as close to unchanged as possible.  (Were this not the case, a country could decide to re-base solely as a strategic means to avoid payments to holders of GDP-linked securities.)  The Governing Documents contain such explicit provisions, (*see, e.g.*, Ex. B at R-3; Ex. D at R-2.), but Argentina intentionally ignored the plain language of the Governing Documents to avoid paying holders of the GDP Warrants.

56.    The Governing Documents set forth certain conditions where, if met, the holders of the GDP Warrants are entitled to payments from Argentina.  The conditions set forth within the Governing Documents rely on 1993 prices because that was the base year used in INDEC's GDP statistics at the time the GDP Warrants were issued.  The Governing Documents also mandate that for any Reference Year, calculations as to whether holders of the GDP Warrants are entitled to payments occur on "the 1st of November of the calendar year following such Reference Year" and, if the holders are entitled to payment, then such payment should occur on "the 15th of December of the calendar year following such Reference Year."  (Ex. B at R-3, R-4; Ex. D at R-3, R-4.)

57.    Argentina's decision to re-base to 2004 prices, even if made for legitimate reasons (which is far from clear) provided an opportunity for Argentina to avoid its 2013 payment obligations on the GDP Warrants by sowing confusion, thereby allowing it to mask its deliberate

18

failure to follow the procedures set forth within the Governing Documents.  Argentina took full advantage of that opportunity.

58.     In particular, as discussed below, the first criteria for determining whether Argentina's payment obligations is triggered is determining whether Actual Real GDP is greater than "Base Case GDP" (which is a set figure identified in a chart within the Global Security). However, the Global Security specifically requires that, in the event of a rebasing, the "Base Case GDP" must be adjusted to account for the rebasing.  Specifically, the Global Security provides that:

> if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP for **each Reference Year shall be adjusted** to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for such Reference Year . . . by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices.

(Ex. B at R-2 – R-3 (Defining "Base Case GDP", emphasis added); Ex. D at R-2 (same).)

59.     Because Base Case GDP forms the basis of determining both payment thresholds under the Governing Documents, and payment amounts, the adjustments requirements within the Global Security are critical to ensure that holders of the GDP Warrants maintain the benefit of their bargain (*i.e.* that their bargained for rights with respect to payment and the amount of such payment remained intact despite rebasing).  Indeed, so fundamental was this obligation to the rights of the holders of GDP Warrants that any modification that would "change the method of calculation of the Payment Amounts" was classified as a "Reserved Matter" under Section 22 of the Global Security.  (Other "Reserved Matters" include changes to the date of payments under the GDP Warrants, the notional amount of the GDP Warrants, or the expiration date of the GDP

Warrants.)  Any modification to a Reserved Matter requires a 75% supermajority vote of the aggregate notional amount of GDP Warrants outstanding.

60.     Nevertheless, and despite the contractual mandate, after re-basing to 2004 prices in 2014, Argentina knowingly and deliberately ignored the procedures required by the Governing Documents to properly adjust for this recalibration.  And, after intentionally avoiding the unambiguous terms of the Governing Documents, Argentina announced—without basis—that GDP growth in 2013 failed to satisfy these conditions, thus purportedly absolving Argentina of its payment obligations.

**F.     Argentina's Bad Faith Conduct Was Designed To Avoid Payment Of The GDP Warrants**

61.     The Global Security sets forth three conditions that are required to be met prior to holders of the GDP Warrants receiving payment from Argentina.  These conditions are that:

> (i)     "Actual Real GDP for such Reference Year is greater than Base Case GDP for such Reference Year;"
>
> (ii)    "Actual Real GDP Growth for such Reference Year is greater than Base Case GDP Growth for such Reference Year;" and
>
> (iii)   "the aggregate amount of all payments made by [Argentina] hereunder, when added to the amount of such payment, does not exceed the Payment Cap."

(Ex. B at R-5, R-6; Ex. D at R-5.)

62.     Argentina's failure to adjust Base Case GDP taints its purported calculations of each of these three conditions.  In particular, the first two conditions directly involve Base Case GDP and the third condition requires Argentina to calculate the Payment Amount, which can only be properly determined via the use of the adjusted Base Case GDP.[8]  Using a non-adjusted

---

[8] In order to determine the Payment Amount owed to the holders of the GDP Warrants, Argentina is required to calculate the Available Excess GDP.  The Global Security defines Available Excess GDP to mean "for any Reference Year, an amount in Argentine pesos equal to (i) 5% of Excess GDP for such Reference Year, multiplied

Base Case GDP—which is a violation of the Governing Documents—therefore makes it impossible for Argentina to correctly determine whether any of these three conditions were met.

63.     Had Argentina followed the terms of the Governing Documents and properly adjusted its GDP calculations to take the re-basing into account, it would have come to the unavoidable conclusion that all three conditions had been met for 2013 and, therefore, the country was required to make payments to holders of the GDP Warrants.

1.      <u>The First Payment Condition Was Satisfied Because Actual Real GDP For 2013 is Higher than Base Case GDP</u>

64.     Under the Global Security, the first condition that must be met in order to trigger payment to the GDP Warrant holders is that Actual Real GDP for 2013 must be higher than the Base Case GDP for 2013.

65.     The Global Security defines Actual Real GDP to mean, "the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC."  (Ex. B at R-2; Ex. D at R-2.)  The Global Security defines Year of Base Prices to mean 1993; "provided that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year."  (Ex. B at R-5; Ex. D at R-4.)

---

by (ii) the Unit of Currency Coefficient."  (Ex. B at R-2; Ex. D at R-2.)  The Global Security defines "Excess GDP" to mean "for any Reference Year, the amount . . . by which Actual Nominal GDP for such Reference Year exceeds the Nominal Base Case GDP for such Reference Year."  (Ex. B at R-3; Ex. D at R-3.)  Nominal Base Case GDP, in turn, is defined in the Global Security to mean "for any Reference Year, an amount equal to **Base Case GDP** for such Reference Year multiplied by the GDP Deflator for such Reference Year."  (Ex. B at R-4; Ex. D at R-3) (emphasis added).  As a result, in order to accurately determine the Payment Amount, Argentina should have followed the contractually mandated procedures for adjusting the Base Case GDP.

66.     The Global Security includes a chart that explicitly provides the Base Case GDP, assuming 1993 prices, for any given Reference Year through 2034.  (Ex. B at R-2, R-3; Ex. D at R-2.)  This chart is set forth below:

| Reference Year | Base Case GDP (in millions of constant 1993 pesos) | Reference Year | Base Case GDP (in millions of constant 1993 pesos) |
|---|---|---|---|
| 2005 | 287,012.52 | 2020 | 458,555.87 |
| 2006 | 297,211.54 | 2021 | 472,312.54 |
| 2007 | 307,369.47 | 2022 | 486,481.92 |
| 2008 | 317,520.47 | 2023 | 501,076.38 |
| 2009 | 327,968.83 | 2024 | 516,108.67 |
| 2010 | 338,675.94 | 2025 | 531,591.93 |
| 2011 | 349,720.39 | 2026 | 547,539.69 |
| 2012 | 361,124.97 | 2027 | 563,965.88 |
| 2013 | 372,753.73 | 2028 | 580,884.85 |
| 2014 | 384,033.32 | 2029 | 598,311.40 |
| 2015 | 395,554.32 | 2030 | 616,260.74 |
| 2016 | 407,420.95 | 2031 | 634,748.56 |
| 2017 | 419,643.58 | 2032 | 653,791.02 |
| 2018 | 432,232.88 | 2033 | 673,404.75 |
| 2019 | 445,199.87 | 2034 | 693,606.89 |

67.     The Global Security goes on to note that should INDEC employ a base year other than 1993, "then the Base Case GDP for each Reference Year shall be adjusted to reflect any such change."  (Ex. B at R-3; Ex. D at R-2.)  As explained above, this adjustment is completed by "multiplying the Base Case GDP for such Reference Year [(as provided in a chart included within the Global Security)] by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices."  (*Id.*).  This equation is set forth below:



68.     To the extent that the Actual Real GDP for a given year exceeds the Base Case GDP in the chart (or the adjusted calculation following re-basing), then the first condition for payment under the GDP Warrants is satisfied.

69.     Despite re-basing in 2014, Argentina failed to determine the 2013 Base Case GDP adjusted for 2004 prices and therefore never actually calculated whether the first condition had been satisfied.  In order to calculate the 2013 Base Case GDP adjusted for 2004 prices, Argentina would have had to calculate the Actual Real GDP for 2013 in constant 1993 prices.  It had calculated it for the first three quarters of 2013.  Completing the calculation for the entire year, as it had done previously, was entirely within its power and control.  By neglecting to calculate the 2013 Base Case GDP adjusted for 2004 prices, Argentina willfully sought to avoid the obligations it owed to holders of the GDP Warrants.

70.     However, notwithstanding Argentina's attempted obfuscation, it is possible to calculate Argentina's GDP growth rate using the EMAE Index.  In February 2014, the EMAE Index indicated that the GDP growth rate for 2013 was 4.91%.  As mentioned, the EMAE Index has historically proven to be an incredibly reliable predictor of GDP growth rates subsequently published by INDEC.  Applying that growth rate to the 2012 Actual Real GDP in 1993 prices (taken from INDEC) yields ARS 491,294.58 MM[9] as the 2013 Actual Real GDP in 1993 prices. This is expressed as follows:

$$\underset{\substack{\text{2013 Actual Real GDP} \\ \text{(1993 prices)}}}{\textbf{ARS 491,294.58 MM}} = \underset{\substack{\text{2012 Actual Real GDP} \\ \text{(1993 prices)}}}{\textbf{ARS 468,301 MM}} \times \underset{\substack{\text{(2013 growth rate in 1993 prices)}}}{\textbf{1 + 4.91\%}}$$

[9] For the purposes of this complaint, all calculations are made without rounding, but are displayed only to the nearest one-hundredth.  Differences between the figures used herein and those in other complaints filed against Argentina are believed to be the result of differences in rounding methodologies.  Any such differences are immaterial and in no way impact the ultimate allegations or conclusions set forth in this Complaint.

71.     When compared to Base Case GDP in 1993 prices (ARS 372,753.73 MM, included within the Global Security table, above), it is clear the first condition for payments to the holders of the GDP Warrants would have been satisfied had Argentina not rebased.

**ARS 491,294.58 MM**
2013 Actual Real GDP
(1993 prices)

>

**ARS 372,753.73 MM**
2013 Base Case GDP
(1993 prices)

72.     Of course, because of the rebasing, Argentina was obligated to perform additional calculations under the terms of the Global Security in order to convert all numbers appropriately to 2004 prices.  However, even with these conversions, Actual Real GDP (in 2004 prices) would have exceeded Base Case GDP (in 2004 prices).  Taking the 2013 Actual Real GDP and applying the calculation included within the Governing Documents to adjust for rebasing, set forth within paragraph 67 above (dividing the 2013 Actual Real GDP in 2004 prices (869,520.38 MM, as published by INDEC) by the 2013 Actual Real GDP in 1993 prices (ARS 491,294.58 MM, based on the EMAE Index) and then multiplying by the 2013 Base Case GDP in 1993 prices (ARS 372,753.73 MM, included within the Global Security)), yields ARS 659,720.21 MM as the 2013 Base Case GDP in 2004 prices.  This is expressed as follows:



73.     Because the 2013 Actual Real GDP in 2004 prices (ARS 869,520.38 MM) was higher than the adjusted 2013 Base Case GDP in 2004 prices (ARS 659,720.21 MM) the first condition for payments to the holders of the GDP Warrants was satisfied.



ARS 869,520.38 MM
2013 Actual Real GDP
(2004 prices)

\>

ARS 659,720.21 MM
2013 Base Case GDP
(2004 prices)

2.     <u>The Second Payment Condition Was Satisfied Because Actual Real GDP Growth is Greater than Base Case GDP Growth</u>

74.     The second condition that was required to be met prior to payment to holders of the GDP Warrants is that Actual Real GDP Growth from 2012 to 2013 must be greater than the Base Case GDP Growth from 2012 to 2013.

75.     Actual Real GDP Growth is defined within the Global Security to mean "the percentage change in Actual Real GDP for [a given] Reference Year, as compared to Actual Real GDP for the immediately preceding Reference Year." (Ex. B at R-2; Ex. D at R-2.)  Base Case GDP Growth is defined within the Global Security to mean "the percentage change in Base Case GDP for [a given] Reference Year, as compared to Base Case GDP for the immediately preceding Reference Year." (Ex. B at R-3; Ex. D at R-3.)   As described within paragraphs 66-67, the Global Security includes a chart that sets forth the Base Case GDP for a 1993 base year, as well as a calculation to determine Base Case GDP should Argentina decide to re-base.

76.     Because Actual Real GDP Growth and Base Case GDP Growth measure change in year-over-year GDP, and GDP is a function of pricing for goods and services, it is imperative (and logical) to express such growth in the same base year price for a valid comparison.  Until 2014, this was not an issue for Argentina.  The Base Case GDP published in the Global Security was expressed in 1993 prices, and Argentina used 1993 prices to calculate Actual Real GDP.

25

Thus, as set forth in the Global Security, one could simply compare Argentina's Actual Real GDP Growth to its Base Case GDP Growth and determine which was greater without accounting for any change in base year price.

77.     However, Argentina's decision to re-base to 2004 prices in 2014 meant the Base Case GDP expressed in the Global Security could no longer be used.  Instead, under the Governing Documents, Argentina was required to convert the Base Case GDP to 2004 prices so that an accurate assessment of growth rates could be undertaken.  Specifically, as set out above, the Governing Documents mandate that the Base Case GDP be adjusted by "multiplying the Base Case GDP for such Reference Year . . . by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices."

78.     Thus, pursuant to the straightforward procedures set forth in the Governing Documents, prior to any determination of whether Actual Real GDP Growth exceeded Base Case GDP Growth, Argentina was required to take the following steps:

> (i)     take the 2013 Base Case GDP in 1993 prices that is provided from the chart included within the Global Security;
>
> (ii)    separately divide the Actual Real GDP for 2013 measured in 2004 prices by the Actual Real GDP for 2013 in 1993 prices; and
>
> (iii)   multiply the 2013 Base Case GDP from step (i) by the result of the division indicated in step (ii).

(Ex. B at R-3; Ex. D at R-2.)

79.     Against all reason, Argentina failed to follow these contractually mandated procedures.  Indeed, in a clear attempt to shirk its payment obligations, Argentina failed to

publish its 2013 Actual Real GDP measured in 1993 prices *in toto* to prevent holders of GDP

Warrants (such as the Plaintiffs) from engaging in the appropriate calculations.

80.     To make matters worse, Argentina took the additional (and mathematically

illogical) step of comparing the Actual Real GDP Growth for 2013 *using 2004 prices* with the

Base Case GDP Growth *using 1993 prices*.  *See* 683 Capital Partners Complaint, ¶ 82.

Argentina then cited this apples-to-oranges comparison to justify its contention that Actual Real

GDP Growth did not, in fact, exceed Base Case GDP Growth, and therefore the second condition

of the GDP Warrant payment provision had not been satisfied.  Argentina had no good faith

basis to engage in such an intellectually disingenuous exercise, nor was it permitted to do so

under the Governing Documents.

81.     Of course, had Argentina published the Actual 2013 GDP data in 1993 prices (as

it was obligated to) and then engaged in the re-basing analysis prescribed by the Governing

Documents, Argentina would have reached a very different result.  Indeed, using the Actual Real

GDP numbers published by INDEC for 2012 (ARS 844,807.46 MM) and 2013 (ARS 869,520.38

MM), *measured in 2004 prices*, the Actual Real GDP Growth for Reference Year 2013 was

2.93%.

82.     As discussed in paragraph 72 above, the Base Case GDP using 2004 prices for

2013 was ARS 659,720.21 MM.  However, because this condition requires Argentina to

compare the Base Case GDP for the Reference Year (2013) with the year prior (2012), a similar

calculation has to be made for 2012.  Using the same formula set forth in paragraph 67, it is

possible to calculate the Base Case GDP for 2012 in 2004 prices using data published by

INDEC.  Specifically, taking the 2012 Base Case GDP in 1993 prices (ARS 361,124.97 MM,

included within the Global Security) and multiplying it by a ratio of the 2012 Actual Real GDP

in 2004 prices (ARS 844,807.46 MM, published by INDEC) over the 2012 Actual Real GDP in

1993 prices (ARS 468,301 MM, published by INDEC) results in a 2012 Base Case GDP in 2004

prices of **ARS 651,463.62 MM**.  Dividing the Base Case GDP in 2004 prices for 2013 (ARS

659,720.21 MM) by the Base Case GDP in 2004 prices for 2012 (ARS 651,463.62 MM)

provides a **Base Case GDP Growth rate of 1.27%** (ARS 659,720.21 MM divided by ARS

651,463.62 MM, minus 1).

83.     Comparing the Base Case GDP Growth (1.27%) rate adjusted for 2004 prices

with the Actual Real GDP Growth for 2013 in 2004 prices (2.93%) it is clear that the 2013

Actual Real GDP Growth Rate is higher.  As a result, the second condition for payment under

the terms of the Governing Documents was satisfied.  This comparison is expressed as follows:



3.     <u>Payment Amount</u>

84.     In order to determine whether the third condition requiring payment under the

GDP Warrants has been satisfied, Argentina has to separately calculate the Payment Amount.

85.     The Global Security defines Payment Amount to mean "an amount equal to (i) the

Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to

such Payment Date, multiplied by (ii) the notional amount of this Security outstanding as of such

Payment Date."  (Ex. B at R-4; Ex. D at R-3.)

86.     In order to determine the Payment Amount owed to the holders of the GDP

Warrants, Argentina is required to calculate the Available Excess GDP.  The Global Security

defines Available Excess GDP to mean "for any Reference Year, an amount in Argentine pesos

equal to (i) 5% of Excess GDP for such Reference Year, multiplied by (ii) the Unit of Currency

Coefficient."  (Ex. B at R-2; Ex. D at R-2.)   The Unit of Currency Coefficient is defined in the

Global Security to be 0.012225.  (Ex. B at R-4; Ex. D at R-4.)   This equation is set forth below:

$$\text{Available Excess GDP (current ARS)} = \text{Excess GDP (in BN of ARS)} \times 5\% \times \text{Unit of Currency Coefficient}$$

87.     The Global Security defines "Excess GDP" to mean "for any Reference Year, the

amount . . . by which Actual Nominal GDP for such Reference Year exceeds the Nominal Base

Case GDP for such Reference Year."  (Ex. B at R-3; Ex. D at R-3.)   Nominal Base Case GDP,

in turn, is defined in the Global Security to mean "for any Reference Year, an amount equal to

Base Case GDP for such Reference Year multiplied by the GDP Deflator for such Reference

Year."  (Ex. B at R-4; Ex. D at R-3.)   The Global Security subsequently defines GDP Deflator to

mean "for any Reference Year, the number that results from dividing (i) the gross domestic

product of Argentina for such Reference Year measured at the current prices of such Reference

Year, as published by INDEC, by (ii) the Actual Real GDP for such Reference Year."  (Ex. B at

R-4; Ex. D at R-3.)  This equation is set forth below:



88.     Argentina's decision to change the year of base prices to 2004 impacted the calculation as set forth within the Governing Documents.  When calculating the GDP Deflator, Argentina should have used Actual Real GDP in 2004 prices as the denominator as opposed to Actual Real GDP in 1993 prices.  In addition, Base Case GDP was required to be converted from 1993 prices to 2004 prices.  Despite these requirements, Argentina failed to calculate 2013 Base Case GDP adjusted to 2004 prices because one of the inputs required to make that adjustment, 2013 Actual Real GDP in 1993 prices, was never published by INDEC.

89.     However, as calculated in paragraph 72 above, using INDEC's EMAE Index in order to estimate 2013 Actual Real GDP in 1993 prices, the Base Case GDP for 2013 adjusted to 2004 prices was ARS 659,720.21 MM.  Dividing the 2013 Nominal GDP of ARS 3,339,630 MM (published by INDEC) by the 2013 Actual Real GDP of 869,520.38 MM (published by INDEC) results in 3.84 as the GDP Deflator.  Multiplying the GDP Deflator (3.84) by the 2013 Base Case GDP (ARS 659,720.21 MM) adjusted to 2004 prices results in a 2013 Nominal Base Case GDP of ARS 2,533,835.28 MM.

90.     The difference between 2013 Actual Nominal GDP (ARS 3,339,630 MM,

published by INDEC) and 2013 Nominal Base Case GDP (ARS 2,533,835.28 MM) results in a

2013 Excess GDP of ARS 805.79 BN.  This is expressed as follows:



91.     Inserting the Excess GDP into the calculation discussed in paragraph 86 above

(i.e. ARS 805.79 BN x 5% x 0.012225), results in an Available Excess GDP of 0.49 Argentine

pesos per U.S. dollar of notional amount of the GDP Warrants.  This is expressed as

follows:

**0.49**
**Available Excess GDP**
**(current ARS)**      **=**      ARS 805.79 BN
                              Excess GDP      **X**      5% x 0.012225

= 0.061125%

92.     The Global Security provides that in order to convert the Available Excess GDP

from Argentinean pesos to U.S. dollars, Argentina was required to use the average market

exchange rate during the 15 days preceding December 31 of the relevant Reference Year.  For

the year 2013, this exchange rate was 6.41407 ARS/USD.  Dividing the Available Excess GDP

(0. 49) by the exchange rate (6.41407) and multiplying by the notional amount outstanding

($17,192,865,000) results in a payment amount of $1,320,255,073.65 or USD $0.0768 per

notional dollar of GDP Warrants.  This is expressed as follows:



4.    The Third Payment Condition Was Satisfied Because The Aggregate
Amount of All Payments Made on the GDP Warrants Does Not Exceed the
Payment Cap

93.    The third condition required to be met prior to payment to holders of the GDP

Warrants is that the aggregate amount of all payments previously made and the payment to be

made on the GDP Warrants must not, when added, exceed the Payment Cap.

94.    The Global Security defines the Payment Cap as "on any given day, an amount

equal to [a certain percentage – 48.000% for the 2005 GDP Warrants and 40.609% for the 2010

GDP Warrants] of the notional amount of this Security outstanding as of such day."  (Ex. B at R-

4; Ex. D at R-4.)  As of the Calculation Date for 2013, 29.960% of the notional amount – or USD

$0.2996 per notional dollar of GDP warrants – remained under the Payment Cap for both the

2005 and 2010 GDP Warrants.

95.    Because the 2013 Payment Amount – 7.68% of the notional amount, or USD $0.

0768 per notional dollar, of GDP Warrants – was within the remaining Payment Cap – 29.960%

of the notional amount, or USD $0.2996 per notional dollar of GDP warrants – the third condition was satisfied.

96.     Plaintiffs hold a notional amount in excess of USD $ 1 billion notional. Therefore the Payment Amount due in connection with Plaintiffs' GDP Warrants (not including any statutory interest owed or other amounts) is in excess of USD $ 75 million.

### G. Argentina's Decision In December 2014 Not To Make Payments On The GDP Warrants Did Not Have A Binding Effect And Was Made in Bad Faith

97.     In December 2014, Argentina purportedly decided that the conditions required for payment to holders of the GDP Warrants under the Governing Documents were not satisfied for the 2013-year, and therefore no payments to holders of the GDP Warrants were required. Argentina failed to disclose any of the calculations it used to make that determination.

98.     Argentina has argued that its calculations are entitled to complete deference under "binding effect" provisions that are included within the Global Security.  *See Aurelius Capital Master, Ltd v. The Republic of Argentina*, Case No. 19-cv-00351 (LAP) (S.D.N.Y.), Defendant the Republic of Argentina's Memorandum of Law in Support of its Motion to Dismiss the Complaint ("Argentina Brief"), ECF No. 17, at 2.  In particular, there are two "binding effects" provisions within the Global Security, which assert, with little variation, that certain calculations made by the Ministry of Economy hereunder shall be binding on the Trustee, the Registrar, the trustee paying agent and each other trustee paying agent and all Holders of this Security, absent bad faith, willful misconduct or manifest error on the part of the Ministry of Economy.  (Ex. B at R-3, R-4; Ex. D at R-3, R-4.)  Argentina asserts that these clauses within the Global Security vest the Ministry of Economy with the power to make all calculations necessary under the GDP Warrants.

99.     Not so.  Despite Argentina's contentions, the "binding effects" clauses referenced by Argentina are only included within two specific definitions in the Global Security, "Payment Amount" and "Excess GDP."  There is nothing within the Governing Documents that provides Argentina with the authority to disregard additional terms that do not satisfy its agenda.  Argentina was required to calculate adjustments based on its decision to re-base its GDP from 1993 to 2004 prices.  Despite that obligation, Argentina has admitted that it did not make the necessary adjustments required by the Governing Documents.  *See* Argentina Brief at 2 ("2012 was the last year INDEC calculated GDP in constant 1993 prices") and 18 ("INDEC discontinued calculating real GDP in constant 1993 prices.").  Taken to its logical (or, more accurately, illogical) conclusion, Argentina's argument—that the "binding effect" clause is so broad that it affords Argentina free reign to simply ignore provisions of the Governing Documents and arbitrarily make calculations that suit it—effectively eviscerates the plain meaning of the contract, ignores the intent of the parties, and has led to inherently unfair and inequitable results.  Indeed, the express protections on the methodologies for calculating figures such as payment amount (i.e., those allowing modification of the calculation method only upon approval by 75% vote of the notional amount of the GDP Warrants then outstanding) would be rendered completely meaningless.  Because Argentina has brazenly ignored the critical provisions of the Governing Documents related to *how* it must calculate these figures, it is not entitled to the benefit of any "binding effect" clause on its erroneously arrived upon figures.

100.    Moreover, while Argentina may be entitled to deference with respect to technical calculations, for the reasons noted above, the outer boundaries of even a broad "binding effect" must yield to the undeniable fact that the information necessary for Argentina to make the contractually-required calculations was readily available to Argentina (and indeed within

Argentina's control).  This was clearly the case with respect to the 1993 base year prices for 2013.

Argentina was able to produce that information for the first three quarters of 2013, but for a reason

that has never been explained, was somehow unable to provide the fourth quarter numbers that

would have resulted in the calculation of a Payment Amount being owed on the GDP Warrants for

2013.  Not only is there no explanation for Argentina's refusal to produce the required fourth

quarter data, the fact that the EMAE numbers—numbers that have historically proven to be highly

reliable—clearly show that a payment would have been due renders Argentina's reliance on the

"binding effect" clause specious.

101.    Furthermore, under the plain language of the Governing Documents a "binding

effect" provision would not apply to shield Argentina from making payments under the Governing

Documents because no such provision is included within the Global Security's definition of Base

Case GDP, or within the section of the Global Security setting forth the conditions for payment.

102.    Even if the "binding effect" provisions would apply, the Global Security expressly

provides that such provisions would not be applicable to any actions completed "absent bad faith,

willful misconduct or manifest error on the part of the Ministry of Economy."  (Ex. B at R-3, R-4;

Ex. D at R-3, R-4.)  The calculations that Argentina employed in 2014 were done in bad faith with

the intent of skirting its obligations under the Governing Documents, constituted willful

misconduct, and resulted in manifest error.  Leading up to the release of Argentina's 2013 GDP,

Argentina faced political and economic pressure not to make payment on the GDP Warrants.

Knowing such payments would be politically and economically inconvenient, Argentina

intentionally failed to adjust Base Case GDP to reflect the re-basing and then failed to recalculate

the Base Case GDP Growth using the Base Case GDP numbers adjusted to 2004 prices.  In doing

so, Argentina was well aware that the numbers relied upon when making its announcement that it was not required to pay holders of the GDP Warrants were clearly erroneous.

103.    Based on the historically reliable numbers included within the EMAE Index published in February 2014, Argentina was on notice that if it neglected to re-base, real GDP for 2013 would far exceed the minimum amount required to mandate payment under the Governing Documents.  Argentina also was aware that re-basing would not solve the problem because the Governing Documents set forth a procedure that Argentina is required to follow to adjust the conditions to account for any re-basing.

104.    Knowing this, Argentina sought to have it both ways.  It engaged in a re-basing which resulted in lower real GDP numbers, while simultaneously calculating the growth rate without properly adjusting the numbers to account for the re-basing to 2004 prices.  If Argentina had properly adjusted the Base Case GDP Growth, it would be unable to deny that payment was due to holders of the GDP Warrants.

105.    In fact, this view was expressly acknowledged by Guillermo Nielsen, a former Argentine government official who was Secretary of Finance of Argentina when the 2005 GDP Warrants were issued.  Mr. Nielsen acknowledged that an adjustment was necessary and would result in a significantly lower Base Case GDP Growth trigger for when payment was due than the 3.22% implied by the unadjusted figures for Base Case GDP Growth in 1993 prices included within the Global Security.  Mr. Nielsen wrote:

> Without having all the technical information on the new GDP Calculation–which would have been desirable–and leaving aside what we think about the quality of the INDEC data, it can be inferred that if the 2013 growth, calculated on the basis of the 1993 data, was 4.9%, and with the new 2012 and 2013 GDP data, the growth was 3%, the "base case" with the new form of calculation would be approximately 1.38%, significantly lower than 3%.

> In plain English, even with the change of base to 2004 . . . a 3% growth with the new GDP would lead to the coupon also having to be paid this year.[10]

106.     Argentina also sought to avoid having to make payments under the Governing Documents by preventing INDEC from publishing the 2013 Actual Real GDP in 1993 prices.  This information was necessary to calculate the proper adjustments to Base Case GDP and Base Case GDP Growth following the re-basing from 1993 to 2004 prices.  Argentina intentionally denied investors the benefit of this key information in an attempt to undermine investors' rights to recover under the Governing Documents.  This rationale for Argentina's actions is further supported by Argentina's position in the *Aurelius* case that, absent the official 2013 Actual Real GDP in 1993 prices from INDEC, no investor can challenge its determination.

107.     In essence, Argentina denied investors the necessary information to calculate whether certain conditions obligating payment had been met, and then subsequently stated that investors were forbidden from challenging Argentina's own calculations.  This is manifestly unjust, legally untenable, and a breach of both the GDP Warrants and the covenants of good faith and fair dealing of the GDP Warrants.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

108.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 107 as set forth herein.

109.     Under the GDP Warrants, defendant Argentina was contractually obligated to make a Payment Amount of at least USD $0.07680 per notional dollar on December 15, 2014.

---

[10] G. Nielsen & G. Rubinstein, To Pay or Not to Pay: The Coupon Dilemma, La Nacion (Mar. 31, 2014).

110.    Defendant Argentina breached its contractual obligations by failing to calculate the Payment Amount pursuant to the terms of the Governing Documents and to pay such amount when due in accordance with the terms of the Governing Documents.

111.    As a result of Argentina's breach, Plaintiffs are owed, and have suffered damages in an amount to be determined at trial in excess of USD $75 million (USD $0.07680 per notional dollar multiplied by the notional amount of GDP Warrants held by Plaintiffs), along with pre-judgment interest from the date of Argentina's contract breach.

**SECOND CLAIM FOR RELIEF**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

112.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 107 as set forth herein.

113.    Argentina has claimed that because the Argentinian Ministry of Economy holds all authority with respect to "how to address the discontinuance" of Actual Real GDP in 1993 prices, no holder of GDP Warrants can create their own calculations of the Actual Real GDP in order to challenge Argentina's conclusion.  (*Aurelius*, Defendant the Republic of Argentina's Reply in Support of its Motion to Dismiss the Complaint, ECF No. 21, at 2.).

114.    If Argentina's stated belief held true, it would mean that Argentina could unilaterally ignore its obligations under the GDP Warrants and perpetually avoid any potential liability for doing so.

115.    The Governing Documents contain an implied covenant of good faith and fair dealing in the course of performance.  Pursuant to that covenant, Argentina pledged not to do anything that would have the effect of harming Plaintiffs' right to receive the benefits of their contract as provided within the Governing Documents, including frustrating Plaintiffs' rights

under the Governing Documents by depriving Plaintiffs of the value owed or benefitting itself at the expense of Plaintiffs.

116.    Pursuant to the covenant of good faith and fair dealing implied within the Governing Documents, Argentina was obligated to permit INDEC to proceed with the publication of the 2013 full-year Actual Real GDP in base year 1993 prices so that Argentina could calculate a Payment Amount for 2013, and so that Plaintiffs could confirm that calculation if necessary. Argentina breached the covenant of good faith and fair dealing when it prevented INDEC from making this publication, thereby depriving Plaintiffs of the benefit of their bargain and benefitting itself by avoiding a payment to Plaintiffs under the Governing Documents.

117.    At the time of its breach of the covenant, Argentina was aware, based on the earlier published EMAE Index, that a payment would be owed to Plaintiffs for Reference Year 2013, and it stopped INDEC from publishing the 2013 full-year Actual Real GDP in base-year 1993 prices with the goal of depriving Plaintiffs of the payments that they were entitled to as holders of the GDP Warrants, thereby constituting a breach of the implied covenant.

118.    As a result of Argentina's breach of the covenant of good faith and fair dealing, Plaintiffs are owed, and have suffered damages in an amount to be determined at trial, but not less than USD $ 75 million, not including pre-judgment interest, from the date of Argentina's covenant breach.

119.    Further, Argentina's breaches of good faith and fair dealing have cast a pall over both its rebasing and its methodology for calculating its payment obligations under the Governing Documents.  Plaintiffs therefore seek an order requiring Argentina to direct INDEC to calculate and publish Actual Real GDP in 1993 base prices for calendar years 2013 through 2018,

respectively, and to continue providing Actual Real GDP in 1993 base prices for as long as the GDP Warrants remain outstanding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the entry of judgment against defendant as follows:

1. That the Court enter an order awarding Plaintiffs damages in an amount to be determined at trial for their holdings of the GDP Warrants, together with pre-judgment interest and post-judgment interest, as applicable;

2. That the Court enter an order of specific performance requiring Argentina to direct INDEC to publish Actual Real GDP in 1993 base prices for calendar years 2013 through 2018, respectively, and to continue providing Actual Real GDP in 1993 base prices for as long as the GDP Warrants remain outstanding; and

3. That the Court order such other legal and equitable relief as the Court may deem just and proper.

Dated: December 11, 2019
       New York, New York

**LATHAM & WATKINS LLP**

By:  /s/ Christopher J. Clark

       Christopher J. Clark
       Matthew S. Salerno
       885 Third Avenue
       New York, NY 10022
       Tel:  (212) 906-1200
       chris.clark@lw.com
       matthew.salerno@lw.com

       *Attorney for Plaintiffs Adona LLC, Egoz I
       LLC, Egoz II LLC, Mastergen, LLC,
       Erythrina, LLC, AP 2016 1, LLC, AP 2014
       3A, LLC, AP 2014 2, LLC, and WASO
       Holding Corporation*