```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| AURELIUS CAPITAL MASTER, LTD., | |
|                Plaintiff, | 19 Civ. 351 (LAP) |
| -against- | |
| THE REPUBLIC OF ARGENTINA, | |
|                Defendant. | |

| | |
|---|---|
| NOVORIVER S.A., | |
|                Plaintiff, | 19 Civ. 9786 (LAP) |
| -against- | |
| ARGENTINE REPUBLIC, | |
|                Defendant. | |

| | |
|---|---|
| ACP MASTER, LTD., | |
|                Plaintiff, | 19 Civ. 10109 (LAP) |
| -against- | |
| THE REPUBLIC OF ARGENTINA, | |
|                Defendant. | |

| | |
|---|---|
| 683 CAPITAL PARTNERS, LP, | |
|                Plaintiff, | 19 Civ. 10131 (LAP) |
| -against- | |
| THE REPUBLIC OF ARGENTINA, | |
|                Defendant. | |

```
ADONA LLC, EGOZ I LLC, EGOZ II
LLC, MASTERGEN, LLC, ERYTHRINA,
LLC, AP 2016 1, LLC, AP 2014
3A, LLC, AP 2014 2, LLC, AND                    19 Civ. 11338 (LAP)
WASO HOLDING CORPORATION,

                    Plaintiffs,

-against-                                       MEMORANDUM & ORDER

THE REPUBLIC OF ARGENTINA,

                    Defendant.
```

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is the Republic of Argentina's (the "Republic's") motion to dismiss[1] the Amended Complaints filed by each of Plaintiffs Aurelius Capital Master, Ltd. ("Aurelius"), Novoriver S.A. ("Novoriver"), ACP Master, Ltd. ("ACP"), 683 Capital Partners, LP ("683 Capital"), and Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO Holding Corporation

---

[1] (See Defendant the Republic of Argentina's Notice of Motion to Dismiss the Amended Complaints, dated June 8, 2020 [dkt. no. 32 in 19-cv-351; dkt. no. 21 in 19-cv-9786; dkt. no. 22 in 19-cv-10109; dkt. no. 22 in 19-cv-10131; dkt. no. 16 in 19-cv-11338]; see also Defendant the Republic of Argentina's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaints ("Mot."), dated June 8, 2020 [dkt. no. 34 in 19-cv-351; dkt. no. 23 in 19-cv-9786; dkt. no. 24 in 19-cv-10109; dkt. no. 24 in 19-cv-10131; dkt. no. 18 in 19-cv-11338]; Defendant the Republic of Argentina's Reply in Support of its Motion to Dismiss the Amended Complaint ("Reply"), dated Sept. 21, 2021 [dkt. no. 38 in 19-cv351; dkt. no. 26 in 19-cv-9786; dkt. no. 27 in 19-cv-10109; dkt. no. 29 in 19-cv-10131; dkt. no. 22 in 19-cv-11338].)

("Adona," and together with Aurelius, Novoriver, ACP, and 683 Capital, "Plaintiffs").[2]  Plaintiffs, who are holders of GDP-linked debt securities issued by the Republic,  jointly oppose the motion.[3]

In its Original Complaint,[4] Aurelius alleged that the Republic failed to make approximately $61 million in payments required under the terms of securities issued by the Republic, based on the Republic's economic performance.  Aurelius contended that because the securities' governing documents calculated any payment amount using GDP metrics published by the Republic's Instituto Nacional de Estadistica y Censos ("INDEC") --and because INDEC failed to publish GDP data required to calculate the payment amount for 2013 after INDEC rebased its GDP figures--bondholders could substitute the EMEA index, also published by INDEC, to determine the Payment Amount.  The Court

---

[2] (Amended Complaint ("Aurelius AC"), dated Mar. 9, 2020 [dkt. no. 28 in 19-cv-351]; Amended Complaint ("Novoriver AC"), dated Mar. 18, 2020 [dkt. no. 13 in 19-cv-9786]; Amended Complaint ("ACP AC"), dated Mar. 9, 2020 [dkt. no. 14 in 19-cv-10109]; Amended Complaint ("683 AC"), dated Mar. 23, 2020 [dkt. no. 14 in 19-cv-10131]; Amended Complaint ("Adona AC"), dated Mar. 23, 2020 [dkt. no. 8 in 19-cv-1138]) (together, the "Amended Complaints").

[3] (Plaintiffs' Joint Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Amended Complaints, dated Aug. 24, 2020 [dkt. no. 18 in 19-cv-351; dkt. no. 24 in 19-cv-9786; dkt. no. 25 in 19-cv-10109; dkt. no. 25 in 19-cv-10131; dkt. no. 19 in 19-cv-11338].)

[4] (Complaint ("Original Complaint"), dated Jan. 14, 2019 [dkt. no. 1 in 19-cv-351].)

held that the plain terms of the securities' governing documents prohibited such a substitution and dismissed Aurelius' claims without prejudice.  See <u>Aurelius Cap. Master, Ltd. v. Republic of Argentina</u>, No. 19 CIV. 351 (LAP), 2020 WL 70348, at *7-8 (S.D.N.Y. Jan. 7, 2020).

In their Amended Complaints, Aurelius and the other Plaintiffs bring claims against the Republic under New York law for breach of contract, including for breach of the covenant of good faith and fair dealing.  They assert that the Republic breached the terms of the global securities by its failure to cause INDEC to publish 2013 Actual Real GDP in 1993 prices and on the Republic's substitution of other unadjusted GDP figures in light of the unavailability of this data.  Defendant then argues there was no express or implied obligation on behalf of the Republic to cause INDEC to publish these figures, that the Republic had sole discretion to calculate any Payment Amount in the absence of those figures, and that the Republic's good faith and fair dealing claims do not meet Fed. R. Civ. P. 9(b)'s heightened pleading requirements.

For the reasons described below, Defendant's motion to dismiss the Amended Complaints is denied.

I.   **Background**

The Court assumes familiarity with this dispute's general background, which the Court recounted at length in its Order granting the Republic's motion to dismiss Aurelius' Original Complaint ("Original Complaint").  (See Opinion & Order, dated January 7, 2020 ("Op.") [dkt. no. 25 in 19-cv-351]); see also Aurelius Cap. Master Ltd., 2020 WL 70348, at *1-5.

The Court refers to that Opinion insofar as it is relevant to the instant motion and recounts the additional facts as the Amended Complaints allege them.[5]

1. **The Global Securities**

In December 2001, the Republic announced a moratorium on its debt service payments after a sharp increase in the interest payments due on its existing debt.  (Op. at 3.)  Thereafter, in 2005 and 2010, the Republic initiated a voluntary debt exchange program whereby owners of the Republic's defaulted debt could exchange their non-performing bonds for new securities.  (Id. at 4.)  To entice bondholders to make this exchange at a discount, the Republic sweetened the deal:  it also offered exchange participants GDP-linked securities--the 2005 Global Security and

---

[5] The Court accepts as true all factual allegations in the Amended Complaints and draws all reasonable inferences in favor of Plaintiffs.  Marbi Corp. of New York v. Puhekker, 9 F. Supp.2d 425, 427 (S.D.N.Y. 1998).

2010 Global Security[6] at issue--which required the Republic to make additional payouts in the event that the Republic's macroeconomic performance exceeded certain thresholds in each year.  (Id. at 5 n.2.)  The parties dispute whether a Payment Amount is owed to bondholders based on the Republic's economic performance for the calendar year 2013 ("2013 Reference Year"), a sum which would have come due on December 15, 2014.

The 2005 Global Security and 2010 Global Security contain the same material terms.  (Id. at 5 n.5.)  Under the terms of the Global Securities, payment is due for a Reference Year, when, first, Actual Real GDP exceeds Base Case GDP for the relevant Reference Year (the "GDP Subtest").  (Id. at 6.)  The Global Security defines Actual Real GDP as "for any Reference Year, the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC," INDEC being the Instituto Nacional de Estadistica y Censos ("INDEC").  (Ex. B to Aurelius AC, Form of Security ("Global Security") [dkt. no. 28-2 in 19-cv-351] § 1(e) at R-2.)  Base Case GDP is specifically listed for every Reference Year in a chart contained in the Global Security.  (See Global Security § 1(e) at R-3).  As with Actual Real GDP, Base Case GDP figures in the Global Security are calculated

---

[6] Capitalized terms retain the same meanings as in the Court's January 7, 2020 Order.

using 1993 as the Year of Base Prices.  (Id. § 1(e) at R-5).
The Global Security specifies that INDEC, in its discretion, may
elect to change the Year of Base Prices, a process also known as
"rebasing" the GDP calculations.  (See Op. at 11.)  If that
occurs, the Base Case GDP figures listed in the Global Security
must be adjusted using the Adjustment Fraction, "the numerator
of which shall be the Actual Real GDP for such Reference Year
measured in constant prices of the [new] Year of Base Prices,
and the denominator of which shall be the Actual Real GDP for
such Reference Year measured in constant 1993 prices."  (Global
Security § 1(e), at R-3; Op. at 8-9, n.3.)

Even if economic indicators pass the GDP Subtest just
described, the Republic still is only required to make payment
if Actual Real GDP Growth exceeds Base Case GDP Growth for the
Reference Year (the "GDP Growth Subtest").  The Global Security
defines "Actual Real GDP Growth" to mean "for any Reference
Year, the percentage change in Actual Real GDP for such
Reference Year, as compared to Actual Real GDP for the
immediately preceding Reference Year."  (Id. at 9 (citing Global
Security § 1(e) at R-2).)   However, if INDEC has rebased GDP,
the Global Security requires that the new Year of Base Prices be
applied to the Actual Real GDP for the immediately preceding
year.  (Id.)  The Global Security defines "Base Case GDP Growth"
to mean "for any Reference Year, the percentage change in Base

Case GDP for such Reference Year, as compared to Base Case GDP for the immediately preceding Reference Year." (Id. at 10.)

In 2014, INDEC made changes that are relevant to the securities at issue: it elected to rebase its GDP, switching the Year of Base Prices from 1993 to 2004, and also "discontinued the calculation of the Republic's real GDP in constant 1993 prices." (Id. at 10-11). This meant that some of the data required for calculating the Base Case GDP Adjustment Fraction, i.e., the Republic's Actual Real GDP in constant 1993 prices for the full-year 2013, was not available. (Id. at 11.)

### 2. **The Court's January 7, 2020 Order**

In its First Complaint, Aurelius alleged that the Republic owed Global Security holders a payment for the 2013 Reference Year but breached its obligation to pay them. (Id. at 10.) In the absence of published INDEC data for Republic's Actual Real GDP in constant 1993 prices, Aurelius alleged that this payment was due based on a different set of economic data also published by INDEC: the EMAE Index. (Id.) Using the EMAE Index figures, Aurelius calculated a version of the Republic's 2013 Actual Real GDP in constant 1993 prices to show, allegedly, that Actual Real GDP Growth exceeded Base Case GDP Growth for 2013. (Id. at 12-13.) Based on these figures, Aurelius claimed that the Republic breached the Global Securities' terms when the Republic failed to tender payment for the 2013 Reference Year.

The Republic's Motion to Dismiss asserted, principally, that (1) Aurelius had failed to allege that the Republic made its payment calculation in bad faith, by willful misconduct, or in manifest error, the showing required by the Global Securities' "binding effect clause" and (2) the EMAE Index that Aurelius argued should determine the Republic's payment obligation fell outside that prescribed in the securities' governing documents. (Id. at 17.)

The Court agreed with the Republic that the latter ground required dismissal of Aurelius' complaint. In doing so, the Court noted that the Global Security unequivocally stated that the figure for Actual Real GDP, which referred to the version of the Republic's gross domestic product published by INDEC, did not contemplate the EMAE Index as a substitute. (Id. at 19.) The Court also observed that "the Republic was under no explicit contractual obligation to continue to calculate Actual Real GDP using constant 1993 prices, [and] maintained significant discretion under the terms of the Global Security to rebase its GDP." (Id. at 20 n. 7.) The Court granted Aurelius leave to amend its complaint. (Id. at 21.)[7]

---

[7] The parties thereafter stipulated to allow all Plaintiffs to amend their complaints and to coordinate these actions for pre-trial purposes. (See Stipulation & Order, dated Apr. 7, 2020 [dkt. no. 30 in 19-cv-351].)

### 3. **The Amended Complaints**

In their Amended Complaints, Plaintiffs contend the Adjustment Fraction ensures that Argentina cannot deprive Warrant holders of their rights to payment for a given year by simply rebasing its GDP.  Without the Adjustment Fraction and its inputs, Actual Real GDP and Actual Real GDP Growth would be measured in prices of the new Year of Base Prices, while Base Case GDP and Base Case GDP Growth would be measured in 1993 prices, rendering an "apples to apples" comparison of year-over-year figures impossible.  (See Aurelius AC ¶¶ 31-32; Novoriver AC ¶¶ 33-35; ACP AC ¶¶ 31-32; 683 AC ¶¶ 78-79; Adona AC ¶¶ 47-49, 64-65.)

Plaintiffs allege that in 2013, as it was becoming apparent that Argentina would owe a payment under the GDP Warrants for Reference Year 2013, the Republic announced that it was changing the Year of Base Prices from 1993 to 2004.  (See Aurelius AC ¶ 37; Novoriver AC ¶ 39; ACP AC ¶ 37; 683 AC ¶ 57; Adona AC ¶ 57.)   INDEC proceeded to publish Actual Real GDP in 2004 prices for 2012 and 2013, and Actual Real GDP in 1993 prices for 2012, but it did not publish Actual Real GDP in 1993 prices for 2013.  (See Aurelius AC ¶ 38; Novoriver AC ¶ 40; ACP AC ¶ 38; 683 AC ¶¶ 66, 88; Adona AC ¶ 13.)   Had INDEC published Actual Real GDP in 1993 prices, Plaintiffs contend that it would have been clear that a payment was due under the GDP Warrants.  They

contend that Argentina withheld the full-year 2013 figure to hide the fact that a payment was due and to frustrate Warrant holders' ability to calculate the Adjustment Fraction.  (See Aurelius AC ¶ 39; Novoriver AC ¶¶ 41, 76; ACP AC ¶¶ 39, 63; 683 AC ¶¶ 57-59; Adona AC ¶ 86.)

Plaintiffs once again point to the EMAE Index to show that payment would have been due if INDEC had published Actual Real GDP in 1993 prices for 2013.  INDEC published the EMAE Index for the full year 2013, which took into account the Actual Real GDP data measured in 1993 prices published for the first three quarters, used information and methodology used to calculate Actual Real GDP measured in 1993 prices, and exactly tracked Actual Real GDP measured in 1993 prices.  (See Aurelius AC ¶¶ 41-57; Novoriver AC ¶¶ 43-56; ACP AC ¶¶ 41-57; 683 AC ¶¶ 69-91; Adona AC ¶¶ 53-80.)  Based upon data that INDEC published as of the Calculation Date, Plaintiffs contend that the full-year Actual Real GDP for Reference Year 2013 measured in 1993 prices that INDEC should have published can be determined and shows that the Growth Condition was met for Reference Year 2013.  (See Aurelius AC ¶¶ 41-57; Novoriver AC ¶¶ 43-56; ACP AC ¶¶ 41-57; 683 AC ¶¶ 69-91; Adona AC ¶¶ 81-90.)

Plaintiffs further contend that the Republic can cause INDEC to publish data because INDEC is a part of the Ministry of Economy of the Republic and subject to direct oversight by the

President, who may issue instructions and orders to INDEC and
overrule INDEC's decisions.  (Aurelius AC ¶¶ 25, 36, 62;
Novoriver AC ¶¶ 27, 38, 75; ACP AC ¶¶ 25, 36, 62; 683 AC ¶ 44;
Adona AC ¶ 50.)  On these bases, Plaintiffs assert that the
Republic has the power to compel INDEC to publish Actual Real
GDP in 1993 prices.  (Id.)

Plaintiffs assert claims for breach of contract, including
under the implied covenant of good faith and fair dealing.

Plaintiffs contend that the Republic breached the Global
Securities' terms by failing to apply the Adjustment Fraction to
Base Case GDP when calculating Base Case GDP Growth and
calculating the Payment Amount using unadjusted figures instead,
in breach of the Global Securities "Modifications" provision.
(See Aurelius AC ¶¶ 67-68, 73; Novoriver AC ¶¶ 11, 79-80; ACP AC
¶¶ 67-68, 73; 683 AC ¶¶ 10, 17, 123; Adona AC ¶¶ 14, 65-66.)  As
to Plaintiffs' good faith and fair dealing claims, the Amended
Complaints contend that the Republic sought to hide the fact
that the Argentine economy would meet the conditions for a
payment for Reference Year 2013 by inappropriately using
rebasing as an excuse to stop publishing Actual Real GDP in 1993
prices, destroying or injuring the rights of Plaintiffs to
receive the fruits of the contract.  (See Aurelius AC ¶¶ 63, 66-
73; Novoriver AC ¶¶ 63, 85-89; ACP AC ¶¶ 65-73; 683 AC ¶¶ 121-
130; Adona AC ¶¶ 118-129.)

## II.  **Legal Standards**

### 1. **Rule 12(b)(6)**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  That "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Krys v. Pigott, 749 F.3d 117, 128 (2d Cir. 2014).  Evaluating "whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

When considering a motion to dismiss, the Court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences." Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020).  It is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." Id. (ellipsis omitted).  "Accordingly, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (cleaned up).
"While legal conclusions can provide the framework of a
complaint, they must be supported by factual allegations."
Iqbal, 556 U.S. at 679.

### 2. **Breach of Contract**

To state a claim for breach of contract, a "complaint need
only allege (1) the existence of an agreement, (2) adequate
performance of the contract by the plaintiff, (3) breach of
contract by the defendant, and (4) damages." Eternity Glob.
Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168,
177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337,
348 (2d Cir. 1996)). In evaluating a breach of contract claim
on a Rule 12(b)(6) motion to dismiss, a court should "strive to
resolve any contractual ambiguities in [the non-moving party's]
favor." Gerdau Ameristeel US Inc. v. Ameron Int'l. Corp., No.
13 CIV. 07169 (LGS), 2014 WL 3639176, at *3 (S.D.N.Y. July 22,
2014) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. and
Tel. Co., 62 F.3d 69, 72 (2d Cir.1995)). However, a court is
"not constrained to accept the allegations of the complaint in
respect of the construction of the [a]greement." Int'l
Audiotext Network, 62 F.3d at 72. Instead, the Court's primary
charge is determining for itself whether "a contract's language
is clear and unambiguous," which alone allows for the dismissal
of a breach of contract claim on a Rule 12(b)(6) motion.

<u>Oppenheimer & Co., Inc. v. Trans Energy, Inc.</u>, 946 F. Supp.2d
343, 349 (S.D.N.Y. 2013).  <u>See also Georgia-Pacific Consumer</u>
<u>Prods., LP v. Int'l Paper Co.</u>, 566 F. Supp.2d 246, 250 (S.D.N.Y.
2008) ("If a contract is unambiguous on its face, its proper
construction is a question of law.").  "[I]f a contract is
ambiguous as applied to a particular set of facts, a court has
insufficient data to dismiss a complaint for failure to state
[a] claim."  <u>Eternity Global Master Fund Ltd.</u>, 375 F.3d at 178.

### 3. **Applicability of Rule 9(b)**

Plaintiffs and the Republic disagree about whether
Plaintiffs' allegations also must surmount Federal Rule of Civil
Procedure 9(b).

Federal Rule of Civil Procedure 9(b) sets forth the
heightened pleading standards applicable to claims for fraud or
mistake.  <u>Krys v. Pigott</u>, 749 F.3d 117, 129 (2d Cir. 2014).  "In
alleging fraud or mistake, a party must state with particularity
the circumstances constituting fraud or mistake.  Malice,
intent, knowledge, and other conditions of a person's mind may
be alleged generally."  Fed. R. Civ. P. 9(b).  "The
particularity requirement of Rule 9(b) serves to 'provide a
defendant with fair notice of a plaintiff's claim, to safeguard
a defendant's reputation from improvident charges of wrongdoing,
and to protect a defendant against the institution of a strike
suit.'"  <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d Cir. 2004)

(citing O'Brien v. Nat'l Property Analysts Partners, 936 F.2d
674, 676 (2d Cir. 1991)).  Accordingly, under Rule 9(b), a
complaint must "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state
where and when the statements were made, and (4) explain why the
statements were fraudulent."  Acito v. IMCERA Grp., Inc., 47
F.3d 47, 51 (2d Cir.1995) (quoting Mills v. Polar Molecular
Corp., 12 F.3d 1170, 1175 (2d Cir.1993)).

    "By its terms, Rule 9(b) applies to 'all averments of
fraud.'  This wording is cast in terms of the conduct alleged,
and is not limited to allegations styled or denominated as fraud
or expressed in terms of the constituent elements of a fraud
cause of action."  Rombach, 355 F.3d at 171 (citing Fed. R. Civ.
P. 9(b)).  "Courts in the Second Circuit have applied Rule 9(b)
to any cause of action that bears a close legal relationship to
fraud or mistake, as well as to individual claims that, as
pleaded, are predicated on allegations of fraud."  Matsumura v.
Benihana Nat'l. Corp., 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008).
Accordingly, a complaint may sound in fraud even where no fraud
claims are asserted.  Ladmen Partners, Inc. v. Globalstar, Inc.,
No. 07 CIV. 0976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept.
30, 2008).  "The Court must therefore closely scrutinize the
pleadings to determine if Plaintiff's claims sound in fraud."
Id. (citing Rombach, 355 F.3d at 171); see also In re Refco,

Inc. Secs. Litig., 503 F.Supp.2d 611, 631 ("Rombach necessarily
requires a case-by-case analysis of particular pleadings to
determine whether 'the gravamen of the complaint is plainly
fraud.'") (cleaned up).

The Republic argues that the Court should apply Rule 9(b)'s
heightened pleading standards here because the Amended
Complaints' allegations "bear a close relationship to fraud."
(Reply at 11).  Specifically, the Republic points to several
turns of phrase in the Amended Complaints--allegations that the
Republic "manipulated GDP data and calculations," "obscure[d],"
"concealed," and engaged in "attempted obfuscation" to deny
holders of the GDP-linked Securities payment for Reference Year
2013--as indications that Plaintiffs' claim are fraud-based.
(See Mot. at 20-21; Reply at 10-11 (citing Aurelius AC ¶¶ 13,
72; ACP AC ¶¶ 13, 72; Novoriver AC ¶¶ 10, 15, 88; 683 AC ¶¶ 116,
128; Adona AC ¶¶ 13, 76).)  On the other hand, Plaintiffs argue
that Rule 9(b) is inapplicable because Plaintiffs' claims are
for breach of contract and do not sound in fraud.  (Opp. at 24-
28.)  "A claim sounds in fraud when the gravamen of the claim is
that the plaintiff relied upon the defendant's alleged
misrepresentation or omission."  See In re Ford Fusion & C-Max
Fuel Econ. Litig., No. 13 MD 2450 (KMK), 2015 WL 7018369, at *16
(S.D.N.Y. Nov. 12, 2015); see also Rombach, 355 F.3d at 172
(applying Rule 9(b) when complaint alleged that a "statement was

'inaccurate and misleading;' that it contained 'untrue statements of material facts;' and that 'materially false and misleading written statements' were issued").

The Republic cites several cases where courts within this Circuit found that a good faith and fair dealing claim sounded in fraud and applied Rule 9(b) on a motion to dismiss those claims.  (Mot. at 20 n.11.)  For example, in DeBlasio v. Merrill Lynch & Co., plaintiffs claimed that defendant investment advisors concealed their profit incentive in certain financial products "through a series of misleading statements and omissions," which caused plaintiffs to remain invested in those products despite the availability of other, potentially more lucrative investments.  No. 07 CIV. 318 (RJS), 2009 WL 2242605, at *2 (S.D.N.Y. July 27, 2009).  Plaintiffs brought common-law fraud and other claims, also alleging that "by making the misrepresentations and omissions set forth" in the [complaint], the Brokerage Defendants breached the implied covenant of good faith and fair dealing."  Id. at *12.  There, the Court found that because plaintiff's claims for breach of the implied covenant and claims of unjust enrichment were "based on the same allegations of intentional misrepresentations and omissions by Defendants that are described throughout the [complaint], they are subject to Rule 9(b)."  Id.  Likewise, in Fernandez v. UBS AG, plaintiff made similar allegations that defendants

"misrepresented the risks involved in the Funds and pushed plaintiffs to invest in the Funds in order 'to line their own pockets,' without disclosing all of their conflicts of interest and without assessing the suitability of the investments for their clients."  222 F. Supp. 3d 358, 386 (S.D.N.Y. 2016). There, the Court applied 9(b) to plaintiff's claims for breach of the implied covenant of good faith and fair dealing because that claim was "premised on the same allegations of intentional misrepresentations and omissions by defendants" that supported plaintiff's fraud-based claims.  Id.

Unlike in DeBlasio, Fernandez, and the other cases upon which the Republic relies, Plaintiffs' allegations here do not sound in fraud and thus are not subject to Rule 9(b)'s heightened pleading requirements.  The gravamen of Plaintiffs' claim is not that the Republic misrepresented or omitted terms of the GDP Warrants with an intent to induce holders of defaulted bonds to enter into the exchange offer.  Rather, Plaintiffs allege that, years after Warrant holders accepted the exchange offer, the Republic realized it would owe a substantial amount under the agreement and caused the unavailability of data in bad faith to avoid making a required payment, in breach of the Global Securities terms.  (See e.g., Aurelius AC ¶¶ 7-14.) This is unlike Merrill and Fernandez, where the claims clearly were grounded in the same facts as the parallel fraud claims

asserted in those cases.[8]  Accordingly, the Court will evaluate
Plaintiffs' Amended Complaints under Rule 8, not Rule 9(b)'s
heightened pleading requirements applicable to fraud-based
claims.

## III. **Discussion**

The Republic argues that Amended Complaints should be
dismissed because (1) the Global Securities' "Binding Effect"
clause bars the Republic's breach of contract claims (including
under the Global Securities' "Modification" provision) (Opening
at 26-30) and because (2) the Global Securities impose no
obligation on the Republic to cause INDEC to publish data and

---

[8] The additional out-of-circuit cases that the Republic
relies upon do not compel a different result.  (See Reply at 10-
11 n. 5 (citing Lester v. Unitrin Safeguard Ins. Co., 2020 WL
4583839 (N.D. Tex. Aug. 10, 2020) and Toner v. Allstate Ins.
Co., 821 F. Supp. 276, 284 (D. Del. 1993).  Although Lester
observed the Fifth Circuit's regular application of Rule 9(b) to
common law claims brought alongside claims under the Texas
Insurance Code, that court appears to have applied Rule 8
anyway.  2020 WL 4583839, at *3 ("Consequently, plaintiffs
failed to satisfy Rule 8's pleading requirements, and their
claim for breach of the duty of good faith and fair dealing must
be dismissed.").  In Toner, the Court applied Rule 9(b) where
plaintiff's claims were quintessentially fraud based.  Toner,
821 F. Supp. at 285 ("The heart of plaintiffs' claim is . . .
'[Defendant] intentionally and wrongfully induced Plaintiffs
to convert to the NOA program, which was, as still is [sic],
focused on new business . . . while failing to disclose
[defendant]'s intention to change its policies such that new
business would be far more difficult to generate.'").

Plaintiffs' allegations of breach of the implied duty of good faith and fair dealing are otherwise insufficient.[9]

## 1. **The Global Securities' "Modifications Provision"**

In granting the Republic's motion to dismiss Aurelius' Original Complaint, the Court "[r]eject[ed] the Republic's atextual argument that the Global Security's definition of 'Base Case GDP Growth' does not encompass the Adjustment Fraction mandated by the Security's definition of Base Case GDP." Aurelius Cap. Master, Ltd., No. 19 CIV. 351 (LAP), 2020 WL 70348, at *6 n.6.  The Global Securities' terms require the application of the Adjustment Fraction--and thus necessitate a calculation to be made using the inputs that the Adjustment Fraction requires--to determine any Payment Amount for 2013.

Plaintiffs claim that the Republic's decision not to use the Adjustment Fraction in calculating the 2013 Payment Amount,

---

[9] The Republic also contends that the Court should dismiss the Amended Complaints for the same reasons it dismissed Aurelius' first complaint: because, as the Republic sees it, Plaintiffs try once again to substitute the EMAE Index for INDEC's GDP figures.  (See Mot. at 1, 13-15.)  Plaintiffs contend that the Amended Complaints' references to the EMAE Index are not intended to be a "substitute for the missing 'contractually-mandated input,'" but rather . . . support their claim that Argentina knew the missing input from INDEC would establish satisfaction of the growth condition and Plaintiffs' right to payment." (Opp. at 4.)  As discussed infra, the Court considers these allegations in assessing whether Plaintiffs have pled sufficient facts in support of their claim for breach of the implied covenant of good faith and fair dealing.

even after INDEC failed to publish 2013 Actual Real GDP in 1993 prices, breached the express terms of the Global Securities. They say that any decision not to incorporate the Adjustment Fraction required the consent of bondholders.  Specifically, they point to the Global Securities' "Modifications Provision," (see e.g., Aurelius AC ¶ 67; Adona AC ¶ 65; 683 AC ¶ 17; ACP AC ¶ 63; Novoriver AC AC ¶¶ 79-80), which reads:

> Any modification, amendment . . . to the Indenture, the GDP-Linked Securities Authorization or the terms and conditions of the GDP-Linked Securities of one or more Series (including these Securities) may be made, given, or taken pursuant to (i) a written action of the Holders of the GDP-Linked Securities of such affected Series without the need for a meeting, or (ii) by vote of the Holders of the GDP-Linked Securities of such affected Series taken at a meeting or meetings of Holders thereof . . . .

(Global Security § 22 at R-17) (emphasis added).)

For its part, the Republic argues that it was not "modifying" the contract by using unadjusted Actual Real GDP to determine the 2013 Payment Amount.  In the absence of required data from INDEC, the Republic avers that it was simply exercising the discretion that the parties conferred upon it under the Global Securities' so-called "Binding Effect Clause." (Mot. at 26-30, n.18; Reply at 14-15).  That provision, contained within the definition of "Payment Amount," provides in relevant part:

"Payment Amount" means, for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to such Payment Date, multiplied by (ii) the notional amount of this Security outstanding as of such Payment Date . . . . The Payment Amount shall be determined by the Ministry of Economy on the Calculation Date preceding the relevant Payment Date.  <u>All calculations made by the Ministry of Economy hereunder shall be binding on the Trustee, the Registrar, the trustee paying agent and each other trustee paying agent and all Holders of this Security, absent bad faith, willful misconduct or manifest error on the part of the Ministry of Economy</u>.

(Global Security, § 1(e) at R-4 (emphasis added).)

Although this passage is contained within the definition of "Payment Amount," the Republic points to the Trust Indenture,[10] which states that "the word[] . . . 'hereunder' and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision."  (Ex. A. to Aurelius AC, Trust Indenture [dkt. no. 28-1 in 19-cv-351], § 1.1 at 1.)  By this provision, the Republic argues that "[t]he parties thus agreed that the Ministry of Economy would have final say over 'all calculations.'"  (Reply at 14.)  The

---

[10] As the Court noted in its prior order, the Trust Indenture is one of the four documents annexed to Aurelius' Original Complaint that govern the GDP-linked securities here, in addition to the April 30, 2010 First Supplemental Indenture, the 2005 Global Security, and the 2010 Global Security.  <u>See</u> <u>Aurelius Cap. Master, Ltd.</u>, 2020 WL 70348, at *2.

Republic argues that not construing the Binding Effect Clause this way would render it "mere surplusage."  (Reply at 15.)

The Court does not read the Binding Effect Clause as broadly as the Republic advocates.  First, the Modifications Provision that Plaintiffs point to explicitly requires that modifications to certain "Reserved Matters," such as a "change [to] the method of calculation of the Payment Amounts," (Global Security § 22(f), at R-20) (emphasis added), receive the consent of 75% of Warrant holders (id. § 22(b)(ii), at R-17).  "It is a basic tenet of contract law that '[e]ffect should be given to all the contract terms and the specific controls the general.'" Federal Ins. Co. v. Great White Fleet (US) Ltd., 2008 WL 2980029, at *5 (S.D.N.Y. Aug. 1, 2008) (citing J. Aron & Co. v. Askvin, 267 F.2d 276, 277 (2d Cir. 1959)).  Here, the Binding Effect Clause does not specifically address how to calculate the Payment Amount, whereas the Modifications Provision describes what must be done to change how the Payment Amount is calculated.[11]

_____

[11] The Republic cites several cases in support of its argument that the Binding Effect clause requires deference to the Republic's decision to use unadjusted Base Case GDP, but the contractual provisions at issue in those cases are distinguishable, including because they did not fix the inputs required to make the calculations in those cases.  For example, in Rogers Revocable Tr. v. Bank of Am., N.A., the provision at issue expressly provided the defendant could adjust the call strike price in a derivative transaction "in its sole
(continued on following page)

Second, the Global Securities define "Payment Amount" as "(i) the Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to such Payment Date, multiplied by (ii) the notional amount of this Security outstanding as of such Payment Date."  (Global Security § 1(e).) "Available Excess GDP" incorporates the definition of "Excess GDP," which is defined as the extent to which Nominal GDP exceeds the "Nominal Base Case GDP."  (Id.)  This ultimately requires the use of the GDP figures published by INDEC and, to

---

(continued from previous page)
discretion" to reflect certain characteristics of the shares, which did not prescribe specific data that the calculation agent was required to use as inputs.  2008 N.Y. Misc. LEXIS 7471 (N.Y. Sup. Ct. Nov. 13, 2008) ("[N]otwithstanding the above, the Calculation Agent will determine if such Merger Event adjustment affects the theoretical value of the Call Option or Put Option and if so, may in its sole discretion make the adjustment set forth in paragraph (A) under the definition of 'Calculation Agent Adjustment' (as defined in the Equity Definitions) to the terms of the Call Option and Put Option to reflect the characteristics (including without limitation, the volatility, dividend practice and policy and liquidity) of the New Shares."); see also Toledo Fund, LLC v. HSBC Bank USA, Nat'l Ass'n, No. 11 CIV. 7686 KBF, 2012 WL 2850997, at *2 (S.D.N.Y. July 9, 2012) ("The value of the Reference Basket was to be determined by the 'Calculation Agent [HSBC] in its sole discretion.'"); Structured Credit Partners, LLC v. PaineWebber Inc., No. 602112/2001, slip op. at *2-4 (N.Y. Sup. Ct. July 2, 2002) (Ex. 22 to Decl. of Robert J. Giuffra, Jr. [dkt. no. 33-22 in 19-cv-351]) (providing that "[Defendant] and SCP shall share any financing, hedging and arbitrage profit" and that for arbitrage profit "[t]he amount payable pursuant to this section shall be calculated by [Defendant]," but not providing how arbitrage profit should be calculated)).

the extent applicable (i.e., in the event that INDEC rebases its
GDP figures), the Adjustment Fraction.  (Id.)  The Global
Securities therefore require the consent of 75% of bondholders
to modify the application of Adjustment Fraction using Actual
Real GDP measured in constant 1993 prices.

Third, the Global Securities do not otherwise confer upon
the Republic the power to substitute other INDEC-published GDP
figures where INDEC does not publish the data that the Global
Securities call for.  Just as "[Plaintiffs] could have bargained
for language that provided flexibility where INDEC fails to
publish Actual Real GDP data," Aurelius Cap. Master, Ltd., 2020
WL 70348, at *7, the Republic could have done the same.

Accordingly, the Court finds that the Global Securities
explicitly required the Republic to comply with the
Modifications Provision, which required "(i) a written action of
the Holders of the GDP-Linked Securities of such affected Series
without the need for a meeting, or (ii) [a] vote of the Holders
of the GDP-Linked Securities of such affected Series taken at a
meeting or meetings of Holders thereof," (Global Security § 22
at R-17), to use unadjusted Base Case GDP figures to calculate
Base Case GDP Growth and the growth condition for 2013.  This is
a required even after INDEC stopped publishing Actual Real GDP
in 1993 prices, because eschewing the Adjustment Fraction
calculation modified the method of calculation of the Payment

Amount.  Plaintiffs have alleged that the Republic did not obtain such consent before using unadjusted figures to calculate the Payment Amount for the 2013 Reference Year.  Plaintiffs thus have pled sufficient facts to state a claim that the Republic breached the Global Securities' Modification Provision.

### 2. <u>The Republic's Implied Obligations as to INDEC's Publication of Data</u>

In dismissing Aurelius' Original Complaint, the Court observed that "the Republic was under no explicit contractual obligation to continue to calculate Actual Real GDP using constant 1993 prices." <u>Aurelius Cap. Master, Ltd.</u>, 2020 WL 70348, at *7 n.7.  The Republic contends that it had no implied obligation to calculate these figures under the terms of the Global Securities, either.

Plaintiffs, on the other hand, assert at various points in their opposition brief that the Republic had the implied obligation under the Global Securities "to ensure that INDEC published the 'contractually-mandated input.'" (Opp. at 2; <u>see also</u> Opp. at 17-18 ("Any reasonable person in the position of the Warrant holders would be justified in understanding that the Republic would ensure publication of the INDEC data required by the contract.")  They argue that the Republic breached that obligation when INDEC did not publish Actual Real GDP using constant 1993 prices (<u>see e.g.</u>, Opp. at 12.)

By their terms, the Global Securities do not require the
Republic to compel INDEC to publish data, and the Court will not
impose such an obligation.  New York courts are "extremely
reluctant to interpret an agreement as impliedly stating
something" and may not add terms "under the guise of
interpreting the writing." ACE Sec. Corp. v. DB Structured
Prod., Inc., 36 N.E.3d 623, 630 (N.Y. 2015); see Rowe v. Great
Atl. & Pac. Tea Co., 385 N.E.2d 566, 570 (N.Y. 1978) ("[A] party
who asserts the existence of an implied-in-fact covenant bears a
heavy burden.")  "New York law is clear that when interpreting
contracts, courts should apply 'the 'familiar and eminently
sensible proposition of law [ ] that, when parties set down
their agreement in a clear, complete document, their writing
should . . . be enforced according to its terms.''" CCM
Rochester, Inc. v. Federated Invs., Inc., No. 14-CV-3600 VEC,
2014 WL 6674480, at *6 (S.D.N.Y. Nov. 25, 2014) (citing Vermont
Teddy Bear Co., Inc. v. 538 Madison Realty Co., 775 N.Y.S.2d 765
(2004) (alterations in CCM Rochester).  "[C]ourts may not by
construction add or excise terms, nor distort the meaning of
those used and thereby make a new contract for the parties under
the guise of interpreting the writing." Id. (citing Reiss v.
Fin. Performance Corp., 97 N.Y.2d 195, 199 (2001)).

Just as Plaintiffs could have bargained for flexibility to
use alternative statistics in the event that INDEC did not

28

publish the data referenced in the Global Securities, they also could have bargained for a provision requiring INDEC to calculate and publish that data in all circumstances.  Yet the Global Securities do not include such a term.  The Court will not impose such a substantive obligation on the Republic especially when, as here, the parties are "sophisticated, counseled business people."  Ontario, Inc. v. Samsung C & T Corp., 103 N.E.3d 774, 780 (N.Y. 2018); see also CCM Rochester, No. 14-CV-3600 VEC, 2014 WL 6674480, at *6 (S.D.N.Y. Nov. 25, 2014) (rejecting the imposition of an "implied duty to use best efforts" where "the terms of the [contract] d[id] not impose any obligation" to do so).

Although the contract does not impose a categorical duty on the Republic to make INDEC calculate and publish data, Plaintiffs argue that under New York law the Republic cannot cause the non-occurrence of a condition--here, INDEC's publication of Actual Real GDP using constant 1993 prices--in order to avoid making a payment under the Global Securities. Plaintiffs point to New York's prevention doctrine, which recognizes a contract party's "implied obligation not to (1) do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent."  Ixe Banco, S.A. v. MBNA

Am. Bank, N.A., No. 07 CIV. 0432 (LAP), 2008 WL 650403, at *10
(S.D.N.Y. Mar. 7, 2008) (citing Westerbreke Corp. v. Daihatsu
Motor Co., Ltd., 304 F.3d 200, 212 (2d Cir. 2002)).  The
doctrine applies "when 'a party wrongfully prevents [a]
condition from occurring.'"  Grewal v. Cuneo Gilbert & LaDuca
LLP, No. 13-CV-6836 (RA), 2018 WL 4682013, at *11 (S.D.N.Y.
Sept. 28, 2018) (quoting MCI LLC v. Rutgers Cas. Ins. Co., No.
06-CV-4412 (THK), 2007 WL 4258190, at *10 (S.D.N.Y. Dec. 4,
2007)), aff'd, 803 F. App'x 457 (2d Cir. 2020) (emphasis in
Grewal).

It is not clear to the Court that the prevention doctrine
is applicable here.  Several of the cases upon which Plaintiffs
rely, including Ixe Banco, applied the prevention doctrine where
the party invoking the doctrine argued its contract counterparty
had prevented the invoking party's performance.  See e.g., Ixe
Banco, S.A. v. MBNA Am. Bank, N.A., No. 07 CIV. 0432 (LAP), 2009
WL 3124219 (S.D.N.Y. Sept. 29, 2009) (prevention doctrine
precluded defendants from exercising their right to terminate if
defendants frustrated a condition required for plaintiffs to
perform); Arc Elec. Constr. Co. v. George A. Fuller Co., 24
N.Y.2d 99, 103-04 (1969) (applying the prevention doctrine where
"the [defendant's] own act, in terminating the contract . . .
rendered it impossible for [plaintiff] to take any necessary
steps to satisfy [performance]).

30

In other cases cited by Plaintiffs, courts applied the
doctrine where a party prevented the occurrence of a condition
precedent to formation of a binding contract.  See e.g.,
Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of City of
New York, 28 N.Y.2d 101 (1971) (applying the prevention doctrine
where contract stated that it was not binding unless the state
Comptroller endorsed the contract and certified that funds were
available and Comptroller withheld its endorsement at the
request of defendant); Datamaxx Applied Techs., Inc. v. City of
New York, 16-cv-3649 (JGK), 2018 WL 1621536, at *1 (S.D.N.Y.
Mar. 29, 2018) (finding that City could not avoid formation of a
contract where it had frustrated the condition precedent to
formation by withdrawing the contract from the Comptroller's
review); Vanadium Corp. of Am. v. Fid. & Deposit Co. of Md., 159
F.2d 105, 108 (2d Cir. 1947) (upholding jury verdict that
discharged defendants' contractual duties related to the
assignment of a mineral lease where assignment required approval
from the Secretary of the Interior because "plaintiff was
obligated to refrain from positive actions to prevent approval
by the Secretary" and plaintiff breached this condition
precedent); see also Sanofi-Synthelabo Inc. ex rel. Sanofi Grp.
Pension Plan v. Eastman Kodak Co., No. 99 CIV. 4888 LAP, 2000 WL
1611068, at *6 (S.D.N.Y. Oct. 27, 2000) (finding plaintiff pled
breach of the covenant of good faith and fair dealing where

agreement required both parties to obtain IRS determination letters before a distribution of assets occurred and plaintiff alleged that defendant delayed the asset transfer by acting in bad faith in delaying receipt of a determination letter).

Here, Plaintiffs do not allege that any action taken by the Republic prevented Plaintiffs' performance, nor do they allege that the Republic prevented the occurrence of a condition precedent to the formation of a contract (indeed, no party disputes that the Global Securities are binding and enforceable contracts).  Rather they allege that the Republic caused the unavailability of information that deprived Plaintiffs of a contractual right to payment, i.e., the fruits of the contract that they bargained for.[12]  The cases cited by Plaintiffs that have applied the prevention doctrine therefore appear to address slightly different factual scenarios.

The Court need not decide whether Plaintiffs' allegations are sufficient to state a claim under the prevention doctrine because they are clearly sufficient to state a claim under the

---

[12] In one case cited by Plaintiffs, the First Department affirmed denial of third-party defendant's motion to dismiss where it "prevented [third-party plaintiffs from exercising a contractual right] by withholding information pertaining to the properties' operations necessary to ascertain the purchase price and otherwise make an informed decision as to whether to exercise the right," see Rutigliano v. Rutigliano, 10 A.D. 3d 516, 517 (1st Dep't 2004), however it is unclear whether that court relied on the prevention doctrine in doing so.

prevention doctrine's corollary, the doctrine of good faith and
fair dealing.  The prevention doctrine is "similar to-and
perhaps rooted in-the implied covenant of good faith and fair
dealing." Consol. Edison, Inc. v. Ne. Utilities, 426 F.3d 524,
529 (2d Cir. 2005).  "Under New York law, a covenant of good
[faith] and fair dealing is implied in all contracts." Fishoff
v. Coty Inc., 634 F.3d 647, 653 (2d Cir. 2011) (citing Cross &
Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d
Cir. 1989)).  "The implied covenant 'embraces a pledge that
neither party shall do anything which will have the effect of
destroying or injuring the right of the other party to receive
the fruits of the contract.'" Int'l Techs. Mktg., Inc. v.
Verint Sys., Ltd., 157 F. Supp. 3d 352, 368 (S.D.N.Y. 2016)
(quoting 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98
N.Y.2d 144 (2002)).  "The duties of good faith and fair dealing
'do not imply obligations inconsistent with other terms of the
contractual relationship . . . [but] do encompass any promises
which a reasonable person in the position of the promisee would
be justified in understanding were included.'" CCM Rochester,
2014 WL 6674480, at *6 (citing 511 W. 232nd Owners Corp, 98
N.Y.2d at 153 (citations and internal quotations omitted).  "For
a complaint to state a cause of action alleging breach of an
implied covenant of good faith and fair dealing, the plaintiff
must allege facts which tend to show that the defendant sought

33

to prevent performance of the contract or to withhold its benefits from the plaintiff." Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank, 552 F. App'x 13, 16 (2d Cir. 2014) (quoting Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (2d Dep't 1999)).

Taken as true, the allegations in Plaintiffs' Amended Complaints are sufficient to allege that the Republic violated the implied covenant of good faith and fair dealing. Plaintiffs have alleged that the Republic was aware that it would owe a payment to Warrant holders if Base Case GDP Growth was calculated based on adjusted Base Case GDP. (Aurelius AC ¶ 72; ACP AC ¶ 72; Novoriver AC ¶ 76; 683 AC ¶ 128; Adona AC ¶ 127.) Although Plaintiffs do not contend that the EMAE index should be adopted as the contractual input here (as Aurelius did in its first complaint), Plaintiffs point to data published by INDEC-- including the EMAE Index for 2013, and Actual Real GDP in 1993 prices for the first three quarters of 2013--to allege that the Republic was aware that Actual Real GDP Growth for 2013 would have substantially exceeded Base Case GDP Growth for that year if INDEC had published 2013 Actual Real GDP in 1993 prices. (Aurelius AC ¶¶ 37-57; ACP AC ¶¶ 37-57; Novoriver AC ¶¶ 39-56, 69; 683 AC ¶¶ 69-107; Adona AC ¶¶ 55-57, 75-103.) Plaintiffs allege that the Republic caused INDEC to stop publishing data to obscure the fact that a payment was due so as to prevent having

to make payment to bondholders.  (See e.g., Aurelius AC ¶ 13;
ACP AC ¶ 13; Novoriver AC ¶ 88, 683 AC ¶ 11-12, 59; Adona AC
¶ 127.)  These allegations are sufficient to state a claim that
the Republic sought to deprive Plaintiffs of payment for the
2013 Reference Year by causing INDEC not to publish the data
necessary to make such a calculation.[13]

The Republic dismisses Plaintiffs' allegations as a
"conspiracy theory" and offers a laundry list of reasons why it
would not be in the Republic's interest to employ a lower GDP
growth figure to avoid making a payment under the Global
Securities.  (See e.g., Reply at 12.)  It also offers other
explanations as to why INDEC would cease publication of 2013
Actual Real GDP in 1993 prices, including that the decision had
been in the works for many years and came at the insistence of
the International Monetary Fund.[14]  (See Reply at 12-13.)  As

_____

[13] Plaintiffs also have alleged that the Republic took these
actions in bad faith.  See CCM Rochester, 2014 WL 6674480, at *7
("For the same reasons that the Court finds that [the] Complaint
adequately alleges that Federated acted intentionally to
minimize CCM's Earnout Payments, the Court also finds that [the]
Complaint contains sufficient facts to give rise to an inference
that Federated took those actions in bad faith. . . .").

[14] Even assuming that the Court may properly consider the
documents annexed to the Republic's motion that purportedly show
that rebasing came at the IMF's insistence and was in the works
for some time, these facts provide just one possible explanation
for INDEC's discontinuance of Actual Real GDP in 1993 prices for
one quarter of 2013.  The Republic also submits exhibits
(continued on following page)

discussed above, however, Plaintiffs need only surmount Rule 8's pleading requirements, not Rule 9(b)'s.  Plaintiffs must state a plausible claim to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  "'Plausibility' is not certainty." CCM Rochester, 2014 WL 6674480, at *1. Plaintiffs' Amended Complaint does not need to allege "facts which can have no conceivable other explanation, no matter how improbable that explanation may be." Cohen v. SAC Trading Corp., 711 F.3d 353, 360 (2d Cir. 2013).  Because Rule 9(b) is inapplicable here, Plaintiffs need not plead facts that are as "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  (See Mot. at 24.)  And, in any case, the theory that the Republic would try to report lower GDP figures to avoid making a large payment to its creditors is not nearly as implausible as the Republic makes it out to be. Whether discovery will bear out Plaintiffs' contentions is a different story.  At this stage, however, Plaintiffs have alleged sufficient facts which, taken as true, plausibly state a

---

(continued from previous page)
describing the technical independence of INDEC as a matter of Argentine law, (Mot. at 17-18; Reply at 7), but this submission does little to rebut the allegation that the Republic in fact caused INDEC to refrain from publishing data in this instance, especially at the motion to dismiss stage.

claim for breach of the implied covenant of good faith and fair dealing.[15]

## IV.  **Conclusion**

For the foregoing reasons, the Republic's motion to dismiss the Amended Complaints is <u>DENIED</u>.

The Clerk of the Court shall close the open motion at the following docket entries:

- Dkt. no. 32 in 19-cv-351
- Dkt. no. 21 in 19-cv-9786
- Dkt. no. 22 in 19-cv-10109
- Dkt. no. 22 in 19-cv-10131
- Dkt. no. 16 in 19-cv-11338

---

[15] Because Plaintiffs have alleged that distinct conduct amounted to a violation of the express terms of the Global Securities' modification provision (the Republic's alleged unilateral substitution of unadjusted GDP figures) and breach of the implied covenant of good faith and fair dealing (the Republic's alleged causing of INDEC to not calculate 2013 Actual Real GDP in 1993 prices), both claims may be sustained at this stage.  <u>See e.g.</u>, <u>Credit Agricole Corp. v. BDC Fin., LLC</u>, 135 A.D.3d 561, 561 (1st Dep't) ("The motion court correctly found that plaintiffs' causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing are not duplicative. Plaintiffs allege that defendants failed to share collateral ratably, in breach of the express agreements at issue. They also allege that, even if none of the provisions of the agreements were violated, defendants breached the implied covenant of good faith and fair dealing by deliberately manipulating and depressing the bids of other bidders during the auction of the debtor's assets . . ."); <u>see also</u> <u>Dreni v. PrinterOn Am. Corp.</u>, 486 F. Supp. 3d 712, 730 (S.D.N.Y. 2020).

By no later than April 16, 2021, the parties shall confer and propose, by letter, a schedule for proceeding with discovery.

**SO ORDERED.**

Dated:    New York, New York
          March 29, 2021

_Loretta A. Preska_
_____
LORETTA A. PRESKA
Senior United States District Judge